RECEIVED

2004 JUN -1  A 11: 23

DEBRA P. HAC___
U.S. DISTRICT COURT
MIDDLE DIST. ALA

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

SANDRA HOLT, DEBRA GAWOR,     )
POLLY SMITH, JOANN MORRIS,     )
MARTY COOPER, ADELIA HARTZOG,     )
PAUL D. PITTMAN, and MARIE     )
WALKER on behalf of themselves and     )
others similarly situated,     )
    )
    Plaintiffs,     )
    )
v.     )     CIVIL ACTION NUMBER: CV-03-A-748-N
    )
RITE AID CORPORATION,     )
    )
    Defendant.     )

## DEFENDANT RITE AID CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION TO FACILITATE 29 U.S.C. § 216(b) NOTICE

**ASHE, RAFUSE & HILL LLP**
1355 Peachtree Street, N.E.
Suite 500
Atlanta, Georgia 30309-3232
Telephone: (404) 253-6000
Facsimile: (404) 253-6060

**LEHR MIDDLEBROOKS PRICE
  & VREELAND, P.C.**
P.O. Box 11945
Birmingham, Alabama 35202-1945
Telephone: (205) 326-3002
Facsimile: (205) 326-3008

Daniel E. Turner, Esq.
Georgia Bar No. 719330
Nancy E. Rafuse, Esq.
Georgia Bar No. 621717

David J. Middlebrooks, Esq.

*Admitted pro hac vice*

## TABLE OF CONTENTS

Page

I.     **INTRODUCTION** ...................................................................................... 1

II.     **STATEMENT OF RELEVANT FACTS** ...................................................... 1

    A.     RITE AID'S ORGANIZATIONAL STRUCTURE ................................. 1

    B.     RITE AID STORE MANAGERS AND ASSISTANT MANAGERS ARE
        IN CHARGE OF MULTI-MILLION DOLLAR ENTERPRISES ........................ 3

        1.     Store Managers Are In Charge Of The Operations Of Their Stores .......... 3

        2.     Assistant Managers Are In Charge When Store Managers
            Are Not Present ........................................................................................... 5

    C.     THE ACTUAL JOB DUTIES STORE MANAGERS AND ASSISTANT
        MANAGERS PERFORM IN ANY PARTICULAR STORE DIFFER ................ 7

        1.     Each Store's Unique Characteristics Affect What Job Duties
            Store Managers And Assistant Managers Perform ..................................... 7

        2.     The Amount Of Authority Store Managers Delegate To
            Assistant Managers Varies According To The Management
            Style Of The Store Manager And The Experience Level And
            Abilities Of The Assistant Manager ........................................................... 9

    D.     THE ACTUAL JOB DUTIES PERFORMED BY EACH STORE
        MANAGER AND ASSISTANT MANAGER PLAINTIFF DIFFERED ............. 10

        1.     The Hiring Process For Non-Management Store Level Employees .......... 10

        2.     Prioritizing And Assigning Work To Be Performed ................................. 12

        3.     Setting And Adjusting Employees' Work Schedules ................................. 13

        4.     Disciplining And Terminating Employees ................................................ 15

        5.     Handling Employee Disputes And Grievances ......................................... 16

        6.     Training Subordinate Employees .............................................................. 16

        7.     Evaluating Employee Performance ........................................................... 17

        8.     Recommending Promotions And Raises .................................................... 17

i

9.  Accounting For Inventory And Merchandising ..........................................18

10. Responsibility For Customer Service ..........................................................20

11. Preparing And Reviewing Daily, Weekly And Monthly Reports ..............20

12. Balancing The Books And Making Bank Deposits ....................................21

13. Controlling Shrink And Receiving Merchandise .......................................22

14. Documenting And Reporting Incidents And Accidents .............................23

15. Completing Paperwork On A Daily Basis ..................................................23

16. Attending District And Regional Meetings ................................................24

III.  **LEGAL ANALYSIS** ...........................................................................................24

A.  THE STANDARD FOR A COLLECTIVE ACTION
    UNDER SECTION 216(b) .........................................................................25

B.  PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN OF
    PROOF TO DEMONSTRATE SIMILARLY SITUATED
    EMPLOYEES SEEK TO OPT IN ............................................................28

C.  PLAINTIFFS ARE NOT SIMILARLY SITUATED TO ONE
    ANOTHER, LET ALONE A CLASS OF THOUSANDS OF
    FORMER AND CURRENT STORE MANAGERS AND
    ASSISTANT MANAGERS .......................................................................30

    1.  Plaintiffs' Burden of Proof And The Applicable Standard of Review.......31

        a.  Methods of proving other employees are similarly situated...........31

        b.  Plaintiffs fail to demonstrate a uniform policy, plan or
            scheme that created a pattern or practice of alleged violations ......33

        c.  Plaintiffs' and the potential opt-ins' fact-specific claims
            would not further judicial economy ...............................................36

        d.  Plaintiffs are not similarly situated to other Store Managers
            and Assistant Managers ...................................................................37

            i.  Plaintiffs' purported FLSA violation cannot possibly
                be considered collectively.......................................................39

ii.     Determining the percentage of time spent
performing non-managerial job duties is fact
intensive and not dispositive..................................................42

iii.    The pertinent factors other than time are not
subject to collective treatment, and, in any event,
support a conclusion that Plaintiffs are properly
classified as exempt ................................................................45

(a)     The relative importance of the managerial
duties as compared with other types of duties ........46

(b)     The frequency with which the employee
exercises discretionary powers. ...............................51

(c)     Plaintiffs' relative freedom from supervision .........52

(d)     Plaintiffs' compensation was substantially
higher than hourly employees..................................53

(e)     All of these factors suggest Plaintiffs were
properly classified and confirm individual
issues would predominate ........................................54

2.      Plaintiffs Are Not Similarly Situated To The Putative Class
Members With Respect To The Relief They Have Standing To
Pursue .......................................................................................................56

D.      PLAINTIFFS' PROPOSED COLLECTIVE ACTION IS WHOLLY
UNMANAGEABLE.................................................................................................58

1.      Individual Issues And Defenses Predominate ............................................58

2.      Collective Action Treatment Would Be Inefficient....................................61

a.      Opt-in discovery after notice would be unmanageable ..................62

b.      Each individual opt-in would be required to establish
liability and damages ........................................................................62

E.      PLAINTIFFS' EVIDENCE DOES NOT SUPPORT NOTICE OF A
COLLECTIVE ACTION IN THEIR OWN STORES OR
DISTRICTS, LET ALONE NATIONWIDE ...........................................................63

F.      DUE PROCESS PROBLEMS WITH REPRESENTATIONAL PROOF .............67

IV.     CONCLUSION .............................................................................................................70

# TABLE OF AUTHORITIES

## CITATION

Ale v. Tennessee Valley Authority
269 F.3d 680 (6th Cir. 2002) ....................................................................................................38, 58

Aly v. Butts County
841 F. Supp. 1199 (M.D. Ga. 1994) ....................................................................................... .....66

Anderson v. City of Cleveland
90 F. Supp. 2d 906 (E.D. Tenn. 2000)................................................................................... .....38

Armstrong v. Manzo
380 U.S. 545 (1965)............................................................................................................68, 69

Arnold v. Eastern Air Lines, Inc.
712 F.2d 899 (4th Cir. 1983) (per curiam) .............................................................................. .....69

Baldwin v. Trailer Inns, Inc.
266 F.3d 1104 (9th Cir. 2001) ..............................................................................................44, 49

Barron v. Henry County School System
242 F. Supp. 2d 1096 (M.D. Ala. 2003).......................................................................31, 32, 33, 55

Bayles v. American Medical Response of Colorado, Inc.
950 F. Supp. 1053 (D. Colo. 1996).............................................................................58, 59, 61, 69

Bernard v. Household International, Inc.
231 F. Supp. 2d 433 (E.D. Va. 2002) ..................................................................................... .....25

Bohn v. Park City Group, Inc.
94 F.3d 1457 (10th Cir. 1996) ............................................................................................... .....44

Bonilla v. Las Vegas Cigar Co.
61 F. Supp. 2d 1129 (D. Nev. 1999)....................................................................................... .....58

Briggs v. United States
8 Wage & Hour Cas. 798 (Fed. Cl. 2002) ............................................................................... .....55

Brooks v. BellSouth Telecommunications, Inc.
164 F.R.D. 561 (N.D. Ala. 1995),
aff'd, 114 F.3d 1202 (11th Cir. 1997) ...........................................................................26, 31, 32, 58, 63, 65

Burt v. Manville Sales Corp.
116 F.R.D. 276 (D. Colo. 1987) ............................................................................................ .....32

## CITATION

Camper v. Home Quality Management, Inc.
  200 F.R.D. 516 (D. Md. 2000) ................................................................................. .....65

City of Los Angeles v. Lyons
  461 U.S. 95 (1983)....................................................................................................... .....56

Clark v. Dollar General Corp.
  No. 3:00-0729, 2001 WL 878887 (M.D. Tenn. May 23, 2001) ............................................. .....64

Clausman v. Nortel Networks, Inc.
  No. IP02-0400, 2003 WL 21314065 (S.D. Ind. May 1, 2003)................................................ .....54

Consolidation Coal Co. v. Borda
  171 F.3d 175 (4th Cir. 1999) ................................................................................. .....68

Cooke v. General Dynamics Corp.
  993 F. Supp. 56 (D. Conn. 1997)............................................................................. .....38

Cowan v. Treetop Enterprises, Inc.
  120 F. Supp. 2d 672 (M.D. Tenn. 1999).................................................................40, 52

Dalheim v. KDFW-TV
  918 F.2d 1220 (5th Cir. 1990) ................................................................................. .....44

D'Anna v. M/A-COM, Inc.
  903 F. Supp. 889 (D. Md. 1995)............................................................................26, 62

Davis v. Charoen Pokphand (USA), Inc.
  303 F. Supp. 2d 1272 (M.D. Ala. 2004) ......................................................26, 27, 28

Davis v. Marsh
  876 F.2d 1446 (9th Cir. 1989) ................................................................................. .....56

De Jesus Rentas v. Baxter Pharmacy Services Corp.
  286 F. Supp. 2d 235 (D.P.R. 2003) ......................................................................... .....44

Donovan v. Burger King Corp.
  672 F.2d 221 (1st Cir. 1982)........................................................41, 46, 47, 49, 51, 52

Donovan v. Burger King Corp.
  675 F.2d 516 (2d Cir. 1982) ..............................................................41, 45, 49, 51, 52

Donovan v. Waffle House, Inc.
  No. C81-609A, 1983 WL 2108 (N.D. Ga. 1983) ...................................................41, 53

## CITATION

Duncan v. Brockway Standard, Inc.
  No. 1:90-CV-2867, 1992 WL 510256 (N.D. Ga. Sep. 21, 1992)............................................ .....66

Dybach v. Florida Department of Corrections
  942 F.2d 1562 (11th Cir. 1991) ............................................................................................ .....26

EEOC v. MCI International, Inc.
  829 F. Supp. 1438 (D.N.J. 1993)............................................................................................61, 65

Enterprise Fire Fighters' Association v. Watson
  869 F. Supp. 1532 (M.D. Ala. 1994)...................................................................................... .....56

Glefke v. KFC Take Home Food Co.
  No. 92-74371, 1993 WL 521993 (E.D. Mich. Aug. 27, 1993)................................................ .....41

Grayson v. KMart Corp.
  79 F.3d 1086 (11th Cir. 1996) ..............................................................................................25, 26

H&R Block v. Housden
  186 F.R.D. 399 (E.D. Tex. 1999) ........................................................................................... .....30

Hall v. Burk
  No. 301CV2487H, 2002 WL 413901 (N.D. Tex. Mar. 11, 2002) .........................................25, 64

Harper v. Lovett's Buffet, Inc.
  185 F.R.D. 358 (M.D. Ala. 1999)..................................................................29, 31, 33, 63, 64, 65

Hawkins v. Groot Industries, Inc.
  No. 01-C-1731, 2003 WL 22057238 (N.D. Ill. Sep. 2, 2003)................................................56, 57

Haynes v. Singer Co.
  696 F.2d 884 (11th Cir. 1983) ...................................................................................25, 28, 31, 65

Heagney v. European American Bank
  122 F.R.D. 125 (E.D.N.Y. 1988)............................................................................................ .....31

Hipp v. Liberty National Insurance Co.
  252 F.3d 1208 (11th Cir. 2001) (per curiam), cert. denied, 534 U.S. 1127 (2002)..........25, 26, 32

Hoffmann v. Sbarro, Inc.
  982 F. Supp. 249 (S.D.N.Y. 1997) ........................................................................................ .....31

Hoffman-LaRoche, Inc. v. Sperling
  493 U.S. 165 (1989)................................................................................................................25, 61

## CITATION

Horne v. Crown Central Petroleum, Inc.
  775 F. Supp. 189 (D.S.C. 1991) ..............................................................................41, 44

Horne v. United Services Automobile Association
  279 F. Supp. 2d 1231 (M.D. Ala. 2003)............................................25, 26, 28, 33, 35, 36, 63, 64

In re Food Lion, Inc.
  No. 94-2360, 1998 WL 322682 (4th Cir. Jun. 4, 1998) (per curiam).......................................41

In re Masonite Corp.
  170 F.R.D. 417 (E.D. La. 1997) ...............................................................................69

Jackson v. Motel 6 Multipurpose, Inc.
  130 F.3d 999 (11th Cir. 1997) ................................................................................56

Jones v. Virginia Oil Co.
  No. 02-1631, 2003 WL 21699882 (4th Cir. Jul. 23, 2003) (per curiam) ..................................45

Lane Hollow Coal Co. v. Director OWCP
  137 F.3d 799 (4th Cir. 1998) .................................................................................68

Lang v. Kansas City Power & Light Co.
  199 F.R.D. 640 (W.D. Mo. 2001)...............................................................................56

Lerwill v. Inflight Motion Pictures, Inc.
  343 F. Supp. 1027 (N.D. Cal. 1972).........................................................................32

Lusardi v. Lechner
  855 F.2d 1062 (3d Cir. 1988) ................................................................................58

Lusardi v. Xerox Corp.
  118 F.R.D. 351 (D.N.J. 1987) ................................................................58, 60, 68, 69

Lusardi v. Xerox Corp.
  122 F.R.D. 463 (D.N.J. 1988) ................................................................................65

Mackenzie v. Kindred Hospitals East
  276 F. Supp. 2d 1211 (M.D. Fla. 2003)......................................................................28

Malcolm v. National Gypsum Co.
  995 F.2d 346 (2d Cir. 1993) ..................................................................................68

Marsh v. Butler County School System
  242 F. Supp. 2d 1086 (M.D. Ala. 2003)..............................................28, 31, 32, 33, 55

## CITATION

Marshall v. Sally Beauty Co.
  No. 80-4138, 1982 WL 2184, (E.D. La. Apr. 19, 1982) ........................................................ .....53

Masilionis v. Falley's, Inc.
  904 F. Supp. 1224 (D. Kan. 1995)............................................................................................ .....41

McLaughlin v. Richland Shoe Co.
  486 U.S. 128, 108 S. Ct. 1677 (1988)...................................................................................... .....66

McQuay v. AIG, Inc.
  No. 4:01CV00661, 2002 WL 31475212 (E.D. Ark. Oct. 25, 2002)......................................... .....65

Meyer v. Worsley Companies, Inc.
  881 F. Supp. 1014 (E.D.N.C. 1994) ........................................................................................ .....40

Mielke v. Laidlaw Transit, Inc.
  No. 00-C-669, 2004 WL 443985 (N.D. Ill. Mar. 4, 2004) ...................................................... .....32

Mike v. Safeco Insurance Co. of America
  274 F. Supp. 2d 216 (D. Conn. 2003)...................................................................................... .....38

Mooney v. Aramco Services Co.
  54 F.3d 1207 (5th Cir. 1995) ..............................................................................................25, 69

Morisky v. Public Service Electricity & Gas Co.
  111 F. Supp. 2d 493 (D.N.J. 2000)........................................................................27, 38, 54, 58, 59

Murray v. Stuckey's Inc.
  939 F.2d 614 (8th Cir. 1991) ...............................................................................40, 45, 49, 51, 52

Murray v. Stuckey's Inc.
  50 F.3d 564 (8th Cir. 1995) ...........................................................................................40, 52, 53

Palazzolo-Robinson v. Sharis Management Corp.
  68 F. Supp. 2d 1186 (W.D. Wash. 1999) ............................................................................... .....41

Ramirez v. Yosemite Water Co.
  978 P.2d 2 (Cal. 1999)............................................................................................................ .....50

Rau v. Darling's Drug Store, Inc.
  388 F. Supp. 877 (W.D. Pa. 1975)......................................................................................... .....49

Ray v. Motel 6 Operating LP
  No. 3-95-828, 1996 WL 938231 (D. Minn. Mar. 18, 1996).................................35, 58, 60, 61, 64

## CITATION

Reed v. Mobile County School System
246 F. Supp. 2d 1227 (S.D. Ala. 2003) .................................................................................25, 29

Reid v. Lockheed Martin Aeronautics Co.
205 F.R.D. 655 (N.D. Ga. 2001) ............................................................................. .....56

Severtson v. Phillips Beverage Co.
137 F.R.D. 264 (D. Minn. 1991) .........................................................................................26, 62

Sheffield v. Orius Corp.
211 F.R.D. 411 (D. Or. 2002)..............................................................................................33, 54

Smith v. Brown & Williamson Tobacco Corp.
174 F.R.D. 90 (W.D. Mo. 1997).............................................................................. .....68

Stricker v. Eastern Off Road Equipment, Inc.
935 F. Supp. 650 (D. Md. 1996)............................................................................. .....40

Sturm v. TOC Retail, Inc.
864 F. Supp. 1346 (M.D. Ga. 1994) ...............................................................................41, 45, 49

Thiessen v. General Electric Capital Corp.
996 F. Supp. 1071 (D. Kan. 1998) ...................................................................................58, 60

Thiessen v. General Electric Capital Corp.
13 F. Supp. 2d 1131 (D. Kan. 1998),
reversed on other grounds, 267 F.3d 1095 (10th Cir. 2001),
cert. denied, 536 U.S. 934 (2002)............................................................................. .....60

Thomas v. Jones Restaurants, Inc.
64 F. Supp. 2d 1205 (M.D. Ala. 1999)................................................40, 45, 46, 47, 48, 50, 53, 54

Tucker v. Labor Leasing, Inc.
872 F. Supp. 941 (M.D. Fla. 1994)...........................................................................32, 59, 64, 65

Ulvin v. Northwestern National Life Insurance Co.
141 F.R.D. 130 (D. Minn. 1991) ..........................................................................................60, 65

United States v. City of Hialeah
140 F.3d 968 (11th Cir. 1998) ..............................................................................................68, 69

Ward v. Johns Hopkins University
861 F. Supp. 367 (D. Md. 1994)............................................................................... .....56

# CITATION

Watts v. Marion County
No. 94-1428-FR, 1995 WL 264189 (D. Or. May 1, 1995) ........................................ ..... 25

White v. Osmose, Inc.
204 F. Supp. 2d 1309 (M.D. Ala. 2002) ................................................................. 26, 33, 57, 65

Wooden v. Board of Regents
247 F.3d 1262 (11th Cir. 2001) ............................................................... ..... 56

29 C.F.R. § 514.19(a) .............................................................................................. ..... 39

29 C.F.R. § 541.102(b) ............................................................................................ 40, 48

29 C.F.R. § 541.103 ................................................................................................ ..... 45

29 C.F.R. § 541.119(a) ............................................................................................ ..... 39

29 C.F.R. § 542.201(b)(2) ........................................................................................ ..... 38

29 U.S.C. § 213(a)(1) .............................................................................................. ..... 39

29 U.S.C. § 216(b) .................................................................................................. ..... 24

29 U.S.C. § 255(a) .................................................................................................. ..... 66

California Labor Code § 515(a) .................................................................................... ..... 55

IWC Wage Order 7-2001 § (A)(1) ................................................................................ ..... 55

## I.    INTRODUCTION

Plaintiffs, all former Store Managers and Assistant Managers, seek conditional

certification of an opt-in class pursuant to 29 U.S.C. § 216(b) against Rite Aid Corporation

("Defendant" or "Rite Aid").  Plaintiffs allege that they are not exempt employees under 29

U.S.C. § 213(a)(1) of the Fair Labor Standards Act ("FLSA") and claim entitlement to overtime

pay.  Plaintiffs bring this action individually and on behalf of a purported opt-in class and seek

Court-authorized notice to a class including more than twelve thousand (12,000) Store Managers

and Assistant Managers in twenty-eight (28) states.  Plaintiffs' brief is a meandering speaking

piece that fails to articulate a plausible theory upon which the Court could conclude that

Plaintiffs are similarly situated to the purported class.  It fails even to articulate an alleged

violation of the FLSA and mischaracterizes the record evidence.  Plaintiffs are so intent on

obtaining conditional certification of a *large* class that they have not articulated whether they

seek conditional certification of a single class of both Store Managers and Assistant Managers or

separate classes.  These Store Managers and Assistant Managers are supervised by different

management personnel and oversee completely different work environments.  Plaintiffs fail to

make the requisite showing that any or all of these putative class members are similarly situated

to Plaintiffs or desire to opt into the purported collective action.  Accordingly, Plaintiffs' motion

for conditional certification should be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    RITE AID'S ORGANIZATIONAL STRUCTURE

The approximately 3,400 Rite Aid brand retail stores are located in twenty-eight (28) states

and the District of Columbia and are owned and operated by wholly owned subsidiaries of Rite

1

Aid Corporation.  Declaration of Kenneth C. Black at ¶ 3, and Exhibit A attached thereto.[1]  The

Rite Aid brand retail stores are divided into three Divisions - East, Central, and West.  Deposition

of Mark Panzer ("Panzer dep.) at 11,[2] and Exhibit 9 to Plaintiffs' Motion (Regional Map).  Each

Division is headed by a Senior Vice President.  Panzer dep. at 11.  The Divisions are divided into a

total of nineteen (19) Regions, which have changed during the relevant period.  Id. at 15-19.  Each

Region has its own management team (including a Regional Vice President) who has discretion

over the operation of the Region.  Id. at 15.  Each Region contains approximately two hundred

(200) stores and is divided into approximately twenty (20) Districts.  Deposition of Samuel Bailey

("Bailey dep.") at 18.  Most Districts contain approximately twenty to twenty-five (20-25) stores.

See id.  Each District is managed by a District Manager.[3]  Panzer dep. at 19.

There are no "normal" Rite Aid stores.  Panzer dep. at 137.  Rite Aid stores are different

from one another, in large part, because the Company grew by acquisition.[4]  Panzer dep. at 137.

Within a single Region, stores can range from 3,000 to 60,000 square feet.  Panzer dep. at 137.

The annual sales volume for Rite Aid stores can range from $1.1 million to $30 million.  Panzer

dec. at ¶ 5.  Some stores are staffed with as few as ten (10) employees, while others have over

one-hundred (100) employees.  Id.  Plaintiffs admit that the day-to-day experiences of Store

---

[1] The Exhibits to this brief are included in three Appendices filed contemporaneously with the brief.
[2] Excerpts from the depositions cited herein are included in Appendix 2 filed contemporaneously with this brief.
[3] District Managers coach, counsel and train Store Managers in their district.  Declaration of Mark Panzer ("Panzer dec.") at ¶ 3, Exhibit 24.  The stores within a District Manager's district can be spread out over several hundred miles.  Id.  District Managers generally visit stores to ensure that they are being run properly.  Id.  Plaintiffs admit that the number of times a District Manager visits stores in his or her district varies by District Manager, as well as the performance of the store and Store Manager.  See, e.g., Deposition of Plaintiff Marie Walker ("Walker dep.") at 136-37.  Given the number of stores in a district, and the geographic proximity of the stores, District Managers do not and cannot manage the operations of each particular store; rather, Store Managers and Assistant Managers, including Plaintiffs, manage them. Panzer dec. at ¶ 3; see, e.g., Walker dep. at 203.
[4] Unlike many nationwide drug store chains, such as Walgreens and CVS, Rite Aid grew by a series of acquisitions, incorporating the employees and policies of the acquired companies.  Panzer dep. at 137; Deposition of Wayne LeClair ("LeClair dep.") at 124.

Managers and Assistant Managers can be very different depending upon the store in which they work. See, e.g., Walker dep. at 161, 190 (job duties of an Assistant Manager vary store-by-store depending on duties delegated by the Store Manager); Deposition of Plaintiff Debra Gawor, ("Gawor dep.") at 276-77 (leadership skills differ among Store Managers and Assistant Managers, so some Store Managers will delegate different duties to their Assistant Managers).

**B.      RITE AID STORE MANAGERS AND ASSISTANT MANAGERS ARE IN CHARGE OF MULTI-MILLION DOLLAR ENTERPRISES**

**1.      Store Managers Are In Charge Of The Operations Of Their Stores**

Plaintiffs concede that Store Managers are in charge of the stores.[5]  Store Managers, in association with their Assistant Manager(s), assume plenary responsibility for the management of their particular store, including its profitability. Panzer dec. at ¶ 3; Hartzog dep. at 149-50, 155-56; Gawor dep. at 362-63; Smith dep. at 144. Rite Aid's Store Manager Job Description states, "The primary purpose of this position is to operate a profitable, clean, and customer service oriented retail store.  Frequent independent judgments are essential." See Store Manager's Job Description, Exhibit 53. It further states that the Store Manager "directly supervises store associates and carries out supervisory responsibilities in accordance with Rite Aid policies and applicable laws.  Responsibilities include interviewing, hiring, training, directing, rewarding, and disciplining associates; appraising associate performance; and resolving complaints."[6]  Id.  Plaintiffs admit that the Store Manager Job Description is an

---

[5] See Deposition of Joanne Morris ("Morris dep.") at 131, 191-92, 214-15, 287; Pittman dep. at 249; Walker dep. at 118; Deposition of Sandra Holt ("Holt dep.") at 121; Deposition of Adelia Hartzog ("Hartzog dep.") at 149-50, 155-56; Gawor dep. at 386; Deposition of Polly Smith ("Smith dep.") at 214-17.

[6] Rite Aid's Store Manager Job Description specifically lists the following job duties and responsibilities: (1) oversee the daily activities of a retail store to ensure its smooth operation; (2) oversee daily banking activities, including ensuring all daily deposits are taken to the bank and the appropriate amount of money is left in the store each evening; (3) review profit and loss ("P&L") and other financial reports to identify sales and expense control opportunities; (4) maintain and communicate to store associates all store

3

accurate statement of Store Managers' duties and responsibilities. Pittman dep. at 150-51;

Walker dep. at 181-82; Hartzog dep. at 148-49; Holt dep. 219-21; Morris dep. at 69; Gawor dep.

at 162-64.[7]  Store Managers who perform the job duties and responsibilities listed in the Store

Manager Job Description are properly classified as exempt employees. LeClair dep. at 91, 96-

97.

      The Plaintiffs in this case who worked as Store Managers ("Store Manager Plaintiffs")

also admit that their job duties and responsibilities included maintaining and operating the store,

supervising employees, ensuring that employees follow and obey all Rite Aid rules and policies,

and managing the operations of the store. Gawor dep. at 212, 363; Smith dep. at 198, 202, 258;

Pittman dep. at 189-90. Hartzog dep. at 185, 198-200, 252-53; Holt dep. at 39, 210-11, 225; see

also Panzer dep. at 208-09. They also admit that they were in charge of and responsible for

supervising employees irrespective of the actual tasks they were performing. Gawor dep. at 386;

Hartzog dep. at 190; Pittman dep. at 197, 249.

---

opening and closing procedures; (5) ensure the store is always neat, clean and well lit; (6) oversee the prevention of shrinkage by enforcing corporate policies and procedures; (7) assist with developing a budget for the store and monitor all activity against the budget throughout the fiscal year; (8) maintain the store management manual by updating it with amended bulletins and implementing the policies and procedures contained within it; (9) ensure prompt service is given to all customers and handle customer complaints and adjustments to returned merchandise; (10) enforce all fire and safety rules and regulations set by the Company and governmental agencies; (11) provide leadership and development for associates by communicating career opportunities, regular performance feedback, and demonstrating RAPTAR ("Recognition, Appreciation, Praise, Treat Associates Respectfully") behaviors; (12) directly supervise store associates and carry out supervisory responsibilities in accordance with Rite Aid policies and applicable laws, including interviewing, hiring, training, rewarding, and disciplining associates; (13) appraise associate performance; and (14) resolve complaints. See Store Manager Job Description.
[7] See also Declarations of Thomas Brogden ("Brogden dec.") at ¶ 2; Johnny Douglas ("Douglas dec.") at ¶ 3; Michelle Goodwin ("Goodwin dec.") ¶ 4; Bill Harbeck ("Harbeck dec.") at ¶ 3; Rita Humphrey ("Humphrey dec.") at ¶ 3; Linda Johnson ("L. Johnson dec.") at ¶ 3; Randy Langston ("Langston dec.") at ¶ 3; Wade Lewis ("Lewis dec.") at ¶ 4; Jason Norris ("Norris dec.") at ¶ 4; Paul Owens ("P. Owens dec.") at ¶ 3; Vickie Reynolds ("Reynolds dec.") at ¶ 3; Terisa Ryals ("Ryals dec.") at ¶ 3; Lynn Watson ("Watson dec.") at ¶ 2, Exhibits 4, 6, 8, 10, 11, 13, 16, 18, 21, 23, 25, 26, and 28, respectively.

2.    **Assistant Managers Are In Charge When Store Managers Are Not Present**

As a general rule, Assistant Managers perform many of the same job duties and have some of the same responsibilities as Store Managers and, in the absence of the Store Manager, assume the responsibilities of the Store Manager and are in charge of the store.[8] Morris dep. at 67-68, 219; Hartzog dep. at 21, 149-50; Walker dep. at 289-91; Panzer dep. at 214-16; see also Assistant Manager Job Description (Assistant Manager must "[c]omplete the duties and responsibilities of the Store Manager in his/her absence").[9]  However, the ultimate scope of an Assistant Manager's job duties is determined by the amount of responsibility an individual Store Manager delegates to him or her.  Walker dep. at 161, 190-93; Hartzog dep. at 16-18, 87, 92; LeClair dep. at 89; Panzer dep. at 182.  See also Goodwin dec. at ¶ 9; Harbeck dec. at ¶ 9; Knox dec. at ¶ 4.

The Assistant Manager Job Description states, "[t]he primary purposes of this position are to assist the Store Manager with the operation of the retail store, to maximize profit and loss (P&L) performance by executing company policies and procedures, and to provide superior customer service.  Frequent independent judgments are essential."  See Assistant Manager Job Description, Exhibit 54.  It further states, "[t]his position directly supervises store associates and

---

[8] Rite Aid provides its Store Managers with a sample rotation schedule. Panzer dec. at ¶ 7, Exhibit A. Although they are not required to follow the sample rotation schedules, Rite Aid suggests that Store Managers and Assistant Managers work different shifts to maximize the management presence in the store. Panzer dec. at ¶ 7. In most stores, the overlapping period when both the Store Manager and Assistant Manager are in the store should be minimal. Id. This generally results in Assistant Managers being the on-duty manager the vast majority of the time that they are on-duty. Morris dep. at 188; Panzer dec. at ¶ 7. For example, in most Rite Aid stores, if the Store Manager opens the store, the Assistant Manager should arrive at the store later in the day and will close the store. Walker dep. at 159-60; Panzer dec. at ¶ 7.

[9] See also Declarations of Vivian Armstrong ("Armstrong dec.") at ¶¶ 4-6; Clifford Aucoin ("Aucion dec.") at ¶¶ 4-6; Gloria Delmore ("Delmore dec.") at ¶¶ 4-6; Janet Gregory-Smith ("Gregory-Smith dec.") at ¶¶ 5-7; Samuel Guthrie ("Guthrie dec.") at ¶¶ 4-6; Bobby Johnson ("B. Johnson dec.") at ¶¶ 4-6; Rachel Kling ("Kling dec.") at ¶¶ 4-6; Felicia Knox ("Knox dec.") at ¶¶ 5-7; Debra Owens ("D. Owens dec.") at ¶¶ 4-6, Exhibits 1, 2, 5, 27, 9, 12, 14, 15, and 22, respectively.

carries out supervisory responsibilities in accordance with Rite Aid policies and applicable laws. Responsibilities include interviewing, hiring, training, directing, rewarding, and disciplining associates; appraising associate performance; and resolving complaints."[10]  Id.  Assistant Managers who perform the job duties and responsibilities listed in the Assistant Manager Job Description are properly classified as exempt employees.  LeClair dep. at 91, 96-97.

The Plaintiffs in this case who worked as Assistant Managers ("Assistant Manager Plaintiffs") uniformly agree that the Assistant Manager Job Description accurately describes their job duties and responsibilities.  Hartzog dep. at 53-54; Morris dep. at 65-68; Walker dep. at 182.  The Assistant Manager Plaintiffs supervised and directed the work of store employees. Morris dep. at 103, 192; Hartzog dep. at 184; Walker dep. at 208-09.  The Assistant Manager Plaintiffs admit they were responsible for supervising and monitoring subordinate employees regardless of the actual job duties they were performing and even if the Store Manager was also

---

[10] Rite Aid's Assistant Manager Job Description specifically lists the following job duties and responsibilities: (1) assist the Store Manager with the operation of the retail store; (2) complete the duties and responsibilities of the Store Manager in his/her absence; (3) enforce all policies and procedures to ensure excellent customer service is provided and to maximize the P&L performance of the store; (4) ensure the appearance of the store is pleasing to the customer and meets the requirements of the corporate office; (5) ensure the store opens and closes at the appropriate time; (6) ensure the proper procedures are followed for cash transactions and bank deposits; (7) interact with vendors to order seasonal and basic merchandise and ice cream (where applicable) for the store; (8) merchandise for the seasonal aisle and non-seasonal, basic, and seasonal end-caps; (9) ensure all merchandise is set up according to plan-o-grams from the corporate office; (10) execute weekly sales ads and price changes; (11) process recalled, damaged, outdated and transferred merchandise; (12) receive merchandise deliveries from vendors and Rite Aid distribution center; (13) verify vendor invoice information is accurate and enter information into the accounts payable system; (14) prepare the retail store for physical inventory by ensuring merchandise on the sales floor and in the stock room is in order and easy to access; (15) utilize Staffworks software to complete the associate work schedule; (16) remain knowledgeable of the One-Hour Photo department and film processing, if applicable; (17) assist the Pharmacy department when there is a high volume of customers; (18) request store maintenance when required; (19) assist with general maintenance of the store, both inside and outside; (20) provide leadership and development for associates by communicating career opportunities, providing regular performance feedback, and demonstrating RAPTAR ("Recognition, Appreciation, Praise, Treat Associates Respectfully") behaviors; (21) enforce all fire and safety rules and regulations set by the company and governmental agencies; (22) directly supervise store associates and carry out supervisory responsibilities in accordance with Rite Aid policies and applicable laws, including interviewing, hiring, training, rewarding and disciplining associates; (23) appraising associate performance; and (24) resolving complaints.  Id.

present. Walker dep. at 56, 118; Morris dep. at 133, 191-92, 244, 287; Hartzog dep. at 185.

Plaintiffs correctly note that in its ongoing efforts to ensure compliance with the FLSA, Rite Aid

classifies some Assistant Managers as non-exempt.[11]  Whether an Assistant Manager is classified

as exempt or non-exempt is based on each store's volume and the number of people that the

Assistant Manager will supervise, the hours the store is open, and any special circumstances.[12]

LeClair dep. at 72-74, 78; Panzer dep. at 40-41, 46-48, 53-54.  For example, an Assistant

Manager who regularly works the graveyard shift in a 24-hour store may not regularly supervise

two or more employees.[13]  Panzer dep. at 41.  The determination of whether an Assistant

Manager is properly classified as exempt is made on a store-by-store basis by the Regional

Human Resources Manager.[14]  Panzer dep. at 41; LeClair dep. at 72-73.

### C. THE ACTUAL JOB DUTIES STORE MANAGERS AND ASSISTANT MANAGERS PERFORM IN ANY PARTICULAR STORE DIFFER

#### 1. Each Store's Unique Characteristics Affect What Job Duties Store Managers And Assistant Managers Perform

The day-to-day experience of Store Managers and Assistant Managers is affected by a

---

[11] Rite Aid created the non-exempt Assistant Manager job classification in October 2002 to convert salaried non-exempt Assistant Managers to hourly non-exempt employees for benefits purposes. LeClair dep. at 101-02.

[12] Rite Aid conducted self-audits (at the District and Regional level) to ensure its Assistant Managers were properly classified as exempt. See Plaintiffs' Brief at 15-16. Plaintiffs misleadingly assert that the United States Department of Labor required Rite Aid to conduct these self-audits. Id. Wayne LeClair testified that Rite Aid undertook these self-audits after an informal inquiry by the United States Department of Labor regarding whether a nighttime Assistant Manager was regularly supervising two or more employees. LeClair dep. at 131. The focus of the self-audits was on whether some salaried Assistant Managers regularly supervised two or more employees, not on whether they performed non-managerial duties as Plaintiffs seek to do here. Id. at 77-80.

[13] However, each store is different. The job duties that an Assistant Manager performs on the graveyard shift in a 24-hour store in Manhattan are different than the job duties performed on the graveyard shift in a 24-hour store in suburban Montgomery. See, generally, Panzer dep. at 41, 51, 53.

[14] Plaintiffs rely on (and mischaracterize) the deposition testimony of Sam Bailey to assert that the job duties of exempt and non-exempt Assistant Managers are the same. See Plaintiffs' Brief at 5. Mr. Bailey was designated as a Rule 30(b)(6) witness to testify concerning compensation. Mark Panzer, Rite Aid's Senior Vice President of Store Operations, who was designated to testify about Assistant Managers' job duties, testified that the job duties vary story-by-store. Panzer dep. at 219-20.

number of different factors, including, but not limited to the following: where a store is located (different income levels and crime levels require different management techniques); the size of the store; the store's hours of operation; the nature of the store's clientele; merchandising and displaying of products; the make-up and types of outside vendor merchandise (e.g., alcohol cannot be sold in all Rite Aid store locations); the volume of sales; the amount of customer traffic; the services offered by each store (e.g., One Hour Photo, "GNC" vitamin department); the available labor pool; staff turnover, which affects the amount and extent of hiring and training; the respective abilities, management styles and experiences of the Store Manager, Assistant Manager, if any, Shift Supervisors, if any, and other store employees; the way in which a Store Manager delegates work to employees and the work which he/she does himself or herself;[15] and how a Store Manager prioritizes and delegates job duties to his or her respective staff. See generally, Pittman dep. at 57-58, 62-63, 78-91, 96, 103-05, 109, 111-12, 209, 211-12; Walker dep. at 240-41, 262-63; Gawor dep. at 86-87, 89-91, 319; Smith dep. at 200; see also Panzer dec. at ¶ 6. All of these factors can affect the number of hours a Store Manager and Assistant Manager work, as well as the types of job duties they perform.[16] Id.

---

[15] The job duties of Store Managers and Assistant Managers are also affected by their District Managers. Like any other managers, District Managers have different management styles and exercise different degrees of control over each store's operations and the Store Manager's job duties. Walker dep. at 213-14; Hartzog dep. at 144-48, 158. For example, most District Managers conduct store visits once a month. Gawor dep. at 264; Holt dep. at 139-40. However, some District Managers conduct store visits "[e]very other week, every third week." Pittman dep. at 218-19; Gawor dep. at 264. Still other District Managers may conduct store visits, "[a]bout every day, seemed like. Probably at least two to three times a week." Pittman dep. at 219-20. The management style and experience level of a District Manager may also directly impact the job duties of a Store Manager and or Assistant Manager. Walker dep. at 214. Moreover, the Store Manager's experience level and the store's fiscal health can impact the level of discretion a District Manager affords to a Store Manager. Id. at 136-37.

[16] For example, one Store Manager Plaintiff (Gawor) testified she was encouraged by another Store Manager (Nadine Brown) to apply for a position at Rite Aid because it was an "easy job." Gawor dep. at 85. However, the stores they worked in "were very different from each other." Id. at 86. The Store Manager who represented that it was an easy job worked in a freestanding Rite Aid One store, whereas the Plaintiff worked in a non-Rite Aid One store located in a shopping center. Id. at 86-87. As a result,

2.    **The Amount Of Authority Store Managers Delegate To Assistant Managers Varies According To The Management Style Of The Store Manager And The Experience Level And Abilities Of Each Assistant Manager**

The job duties Assistant Managers perform vary store-by-store depending on the control and discretion the Store Manager delegates to the Assistant Manager.[17]  Walker dep. at 190. Store Managers can and do have different management styles.  Id.  As one Assistant Manager testified, when she worked under a Store Manager with a controlling management style, "it was hard for [the Store Manager] to let go and let me do some of the tasks that an Assistant Manager does."  Walker dep. at 190-91.  But when this Assistant Manager Plaintiff worked under a different, less controlling Store Manager, she performed more managerial job duties such as scheduling and determining the number of hours each employee worked.  Walker dep. at 189-90.

The job duties and responsibilities of an Assistant Manager will also depend upon the experience level of the Assistant Manager.  Walker dep. at 210; Hartzog dep. at 324.  A Store Manager will likely delegate certain job duties and responsibilities to a well-seasoned Assistant Manager that he or she would not delegate to a new Assistant Manager.[18]  Morris dep. at 111.

---

the Plaintiff could not follow the profit planner in her store, which made her job duties with respect to merchandising different from the Store Manager who worked in the Rite Aid One store.  Id. at 87-89, 185.

[17]      Q.  And the job duties as an Assistant Manager at one store may be different
           than at another store, depending on what the Store Manager delegates,
           correct?
       A.  Right.
       Q.  And what a key supervisor does may also be different depending on what the
           Store Manager and Assistant Manager decide to delegate, correct?
       A.  Right.
Walker dep. at 161.

[18] Unlike Assistant Managers, the authority Store Managers delegate to Shift Supervisors is more circumscribed.  Shift Supervisors are rarely involved in the hiring, firing, disciplining and other job duties requiring discretionary authority and decision-making.  LeClair dep. at 88-89; Panzer dep. at 86. Although they may on occasion perform managerial duties delegated by their Store Managers or Assistant Managers, management is not their primary duty.  Panzer dep. at 57-58.  Plaintiffs admit that the Shift Supervisor Job Description, Exhibit 55, accurately describes Shift Supervisors' job duties and responsibilities.  Walker dep. at 183, 297-98; Pittman dep. at 276.

Thus, a well-seasoned Assistant Manager may perform many job duties, such as scheduling and hiring, which a new Assistant Manager may not.[19]  Walker dep. at 162-63, 210.

**D.     THE ACTUAL JOB DUTIES PERFORMED BY EACH STORE MANAGER AND ASSISTANT MANAGER PLAINTIFF DIFFERED**

Plaintiffs' primary duty was to "run" a clean and profitable store.  Walker dep. at 210-11. Each Manager had discretion to determine how to do so.  Silsby dep. at 70-71.  A common theme among the Plaintiffs is that they chose to "lead by example."  See Smith dep. at 145, 148; Gawor dep. at 249, 308, 327; Holt dep. at 210; Walker dep. at 210.  One Store Manager Plaintiff testified that she got her employees to work by working with them.  Smith dep. at 148.  An Assistant Manager Plaintiff testified that: "[M]y primary duty was to run a good store I mean, not just sit there and manage, but you know, but make sure everything gets done, make sure the store is looking good.  I mean, you can't just stand around and manage.  That's not going to get anything done."  Walker dep. at 210.  Of course, Managers who choose to lead by example and perform the same duties that their subordinate employees perform, will, by nature, perform tasks that could be deemed non-managerial.  It is disingenuous for individuals who choose to lead by example and perform such tasks to then claim that they should be classified as non-exempt employees and given a windfall because of their chosen management style.  Moreover, as shown below, many of the actual duties each Plaintiff chose to perform differed.

**1.     The Hiring Process For Non-Management Store Level Employees**

Plaintiffs' assertion that District Manager approval was required to hire entry-level employees is belied by the facts.[20]  See Plaintiffs' brief at 12.  Plaintiffs were integrally involved

---

[19] One Assistant Manager Plaintiff testified that her Store Manager rarely worked and would "just come and tell people what to do for a few minutes and then [he or she would] leave for the day."  Hartzog dep. at 16-18, 87.  In that case, as a consequence of the Store Manager not properly performing his job, the Assistant Manager Plaintiff worked harder and spent more time in charge of the store than if the Store Manager had properly performed his job.  Id. at 16-18, 92.

in the hiring process. The Store Manager Plaintiffs admit that they pre-screened applicants. See, e.g., Pittman dep. at 159-60. In fact, one Store Manager Plaintiff delegated the authority to pre-screen applicants to both his Assistant Manager and Shift Supervisor. Id. The pre-screening process involved determining whether an interested person would be considered for a position. Smith dep. at 99; Walker dep. at 57-58, see also Rite Aid Policies and Procedure Manual at RAH 01468-77, Exhibit 56. Once candidates cleared a telephonic screening process,[21] the Store Manager Plaintiffs then had discretion to determine who they would interview. Gawor dep. at 82-83; Smith dep. at 100, 106; Walker dep. at 218; Hartzog dep. at 125-26 (interviewed pharmacy employees in addition to front-end employees). One Store Manager Plaintiff had a District Manager participate in the interviews of non-management level employees. Pittman dep. at 160. All but two of the Store Manager Plaintiffs testified that they had discretion to determine which candidates they would hire after the interview process and that District Manager approval was not required. Gawor dep. at 50, 81, 150, 152 (listing numerous people she hired); Morris dep. at 45-46, 79 (District Manager approval was not required); Holt dep. at 62-66; Walker dep. at 57-58, 218. Only two Store Manager Plaintiffs allegedly had to seek approval from their

---

[20] Plaintiffs' form declarations directly contradict their deposition testimony. Compare Hartzog dec. at ¶ 7 (District Manager approval required to hire employees) with Hartzog dep. at 52, 176 (District Manager approval not required to hire employees); see also Exhibits 46 through 52 showing contradictions in testimony for each Plaintiff. Defendant requests that the Court carefully scrutinize Plaintiffs' record citations.

[21] Rite Aid utilizes an outsourced pre-screening process called Quickscreen which potential applicants must complete (by telephone), and which seeks basic background information to weed-out convicted felons and individuals lacking the trustworthiness necessary for such things as handling cash, etc. Panzer dep. at 170-74. Candidates must complete this pre-screening process before they are formally interviewed. Id. Store Managers, or others to whom they delegate such authority, decide which potential candidates will be pre-screened and provide them the necessary information (a card with a telephone number) to complete the process. Id. Store Managers later receive a report indicating whether each person who went through the pre-screening process passed or failed. Id. at 174. Although company policy states otherwise, some Store Managers have hired candidates who did not pass Quickscreen. Id. at 172. It is this process that Plaintiffs rely upon to assert that their discretion to interview and hire candidates is restricted (by "Corporate"). Plaintiffs' Brief at 12.

11

District Managers to hire entry-level employees.  Pittman dep. at 163 (his recommendations were approved 95% of the time); Smith dep. 96, 100-02.

Assistant Managers' roles in the pre-screening, interviewing and selection process varies.[22]  Both Assistant Manager Plaintiffs testified that they participated in interviews.  Walker dep. at 218, 253; Morris dep. at 79.  One Assistant Manager Plaintiff understood that Assistant Managers had discretion to hire employees in some stores, but Shift Supervisors could not. Walker dep. at 145-47, 310.  Another Assistant Manager Plaintiff understood that she could make recommendations but had no authority to hire employees.[23]  Morris dep. at 79.

### 2.    Prioritizing And Assigning Work To Be Performed

The Store Manager in each store is responsible for walking his or her store daily and preparing a Daily Tour Sheet identifying particular tasks that must be completed.  See Store Operations Manual at RAH 01907, Exhibit 57.  Most Store Manager Plaintiffs testified that they prepared the Daily Tour Sheets and used them to prioritize and assign daily tasks to employees. Smith dep. at 172-73, 181 (completed and hung in her office); Gawor dep. at 139-40 (if absent, would prepare a list of tasks the day before), 145-46 (allowed Assistant Manager to assign duties to employees); Pittman dep. at 157-58 (used Daily Tour Sheet to assign duties and plan work for the day); Holt dep. at 117-18, 189.  Plaintiff Gawor admits she did not always prepare a Daily

---

[22] Some Assistant Managers were involved in reviewing job applications, and interviewing and hiring employees. Aucion dec. at ¶ 7; Delmore dec. at ¶ 7; D. Owens dec. at ¶ 7.  Others were only involved in the pre-screening process. B. Johnson dec. at ¶ 7.  Others were not involved in the process at all. Armstrong dec.; Gregory-Smith dec.; Guthrie dec.; Kling dec.; Knox dec.

[23] New hire paperwork was prepared by both the Store Manager and Assistant Manager Plaintiffs, depending on the stores in which they worked. Walker dep. 214-15 (varied store-by-store); Hartzog dep. at 214-16; Smith dep. at 194; Gawor dep. at 377; Pittman dep. at 165 (Shift Supervisors could prepare paperwork in his store, but Store Manager or Assistant Manager always reviewed).  Similarly, new employee orientation, which involved covering work rules and ensuring the new employee understood company policies and procedures, was performed by both the Store Manager and Assistant Manager Plaintiffs, depending on the store. Smith dep. at 194-97; Holt dep. at 108-12; Gawor dep. at 259; Hartzog dep. at 214-16.

Tour Sheet. Gawor dep. at 139-40. If the Store Manager did not prepare the Daily Tour Sheet or delegated the tasks to the Assistant Manager Plaintiffs, in some stores, the Assistant Manager Plaintiffs did and would assign and apportion work to other employees. Morris dep. at 95-96, 100, 105; Walker dep. at 245-46; Hartzog dep. at 153, 179.

### 3. Setting And Adjusting Employees' Work Schedules

Contrary to Plaintiffs' assertions, Plaintiffs were responsible for determining when and how long their employees worked. Until early 2002, when Staffworks[24] became available on-line, the Store Manager or Assistant Manager Plaintiffs manually prepared store schedules.[25] Smith dep. at 118; Holt dep. at 102; Walker dep. at 63-64 (Assistant Manager always did scheduling in one store where Walker worked), 153-54 (varied by store); Hartzog dep. at 46-48 (as Assistant Manager, she did the scheduling both with her Store Manager and by herself), see also Silsby dep. at 29 (before Staffworks, various methods used to schedule employees). After Staffworks went on-line, it would print out a suggested schedule based on input from the Store Manager and Assistant Manager Plaintiffs who then had discretion to alter the suggested schedule to the extent they deemed necessary. Morris dep. at 114 (proposed schedule did not assign duties and could be changed); Gawor dep. at 192 (Store Manager maintained discretion to decide who worked and when); Pittman dep. at 250-52 (Store Manager could completely revise schedule); Walker dep. at 171 (not aware of any company policy that limited the ability to make changes), 313 (Store Managers and Assistant Managers did the scheduling, not Staffworks); Hartzog dep. at 142 (Staffworks was only a tool to help schedule employees). The Store

---

[24] Staffworks is a computer program that, in part, assists with scheduling employees to work in stores by reviewing each store's sales volume and comparing it to employee availability (which must be manually entered) and the store's budget to provide a proposed weekly schedule based on the labor hours needed to run the store. Markley dep. at 20-21, 27, 61.

[25] Although Rite Aid has directed its Store Managers and Assistant Managers to use Staffworks, some continue to manually prepare schedules. Silsby dep. at 25-27.

Manager Plaintiffs, and in some stores the Assistant Manager Plaintiffs,[26] could freely change the proposed schedule based on employee needs, store needs or other factors.[27] Smith dep. at 121-22; Gawor dep. at 191; Morris dep. at 80, 83; Holt dep. at 99; Pittman dep. at 114; Walker dep. at 207; see also Silsby dep. at 104 (can adjust proposed schedules as needed); Markley dep. at 20-21.

Staffworks also did not assign job duties to any employees. That was determined by the manager on duty. Pittman dep. at 166. Staffworks did not schedule the Store Manager or Assistant Manager Plaintiffs. Hartzog dep. at 138-39; Markley dep. at 113. Rather, they agreed on days they would work and manually entered their schedules into Staffworks. Id.

In addition to making changes to schedules in the Staffworks' computer program, the Store Manager and Assistant Manager Plaintiffs (depending on the store) could make handwritten manual changes to account for changes in the schedule such as unexpectedly absent employees. Gawor dep. at 190-91. District Manager approval was not required to make changes to the schedule. Holt dep. at 142 (until Greg Wilson became her District Manager, Holt could make edits to schedules without District Manager approval); Gawor dep. at 195 (no one ever prohibited or instructed Gawor not to make changes to the Staffworks Schedule); Walker dep. at 171 (same). At least one Store Manager Plaintiff believed that District Manager approval was

_____

[26] The person(s) responsible for and involved in the Staffworks scheduling process varies by store. In some stores, both the Store Manager and Assistant Manager Plaintiffs were involved, but the Shift Supervisor was never involved. Walker dep. at 188-89 (in one store only the Store Manager did the scheduling, in other stores both Store Managers and Assistant Managers were involved), 314-15 (the Shift Supervisor was never involved in scheduling in any stores Walker worked at); Pittman dep. at 110 (as a Store Manager, Pittman allowed Assistant Managers and Shift Supervisors to participate in the scheduling process), 110-11 (only Store Manager and Assistant Manager could approve employees' requests for time off), 182 (Store Manager coordinated breaks for employees), 110-11 (Store Manager worked with Assistant Manager to approve time-off for employees).

[27] Although Plaintiffs' allege that Store Managers and Assistant Managers could not change their stores' hours of operation, Plaintiff Holt admits she closed her store ten minutes early everyday because she had a long commute. Holt dep. at 123-24.

14

required to change the schedule only when the change caused her to go over the store's budget. Hartzog dep. at 262.  She also understood that, although overtime was discouraged, it was not prohibited.  Id. at 267; see also Bailey dep. at 76-77.

### 4.    Disciplining And Terminating Employees

The Store Manager Job Description specifically provides that Store Managers have discretion to discipline employees.  See Store Manager Job Description, Exhibit 53 to Plaintiffs' Brief.  All Store Manager Plaintiffs testified that they could discipline store-level employees. Smith dep. at 107 (written discipline), 109 (disciplined pharmacy employees), 117; Gawor at 51; Holt dep. at 103-07 (written and verbal discipline); Pittman dep. at 152-53; Hartzog dep. at 195-205 (disciplined pharmacy employees); cf. Gawor at 43 (no authority over pharmacy employees).  However, one Store Manager Plaintiff believed he was required to obtain District Manager approval before issuing written discipline.  Compare Hartzog dep. at 232 (District Manager approval not required) with Pittman dep. at 188-89 (District Manager approval required).  Some Store Manager Plaintiffs allowed their Assistant Managers to discipline employees without seeking approval from the Store Manager.  Pittman dep. at 189.  At least one Assistant Manager Plaintiff believed that she had authority to discipline employees without Store Manager approval.  Walker dep. at 218.

Store Managers have authority to terminate employees up to an including Shift Supervisors.  Panzer dep. at 198.  At least one Assistant Manager Plaintiff believed that her Store Manager had authority to and did terminate employees.  Walker dep. at 165-66, 304-05.  She also believed that as an Assistant Manager, she had authority to terminate employees, although she never exercised that authority.  Id. at 305, 310-11 (aware of one other Assistant Manager who had authority to terminate employees).  Some Store Manager Plaintiffs testified that they

15

terminated employees. Hartzog dep. at 195-98 (recognized that it was not a bad idea to seek

District Manager advice before termination). Other Store Manager Plaintiffs believed they could

terminate employees for some reasons, but not others. Compare Gawor dec. at ¶ 6 ("I did not

have authority ... to terminate an employee *unless I caught them stealing*....") (emphasis added)

with Holt dec. at ¶ 6 ("I did not have authority to ... terminate an employee *I caught stealing*....")

(emphasis added). At least one Store Manager Plaintiff assumed District Manager approval was

always required before terminating an employee because one District Manager told him so.

Pittman dep. at 126-27. That Store Manager Plaintiff also testified that both Store Managers and

Assistant Managers could recommend termination, and that his recommendation to terminate an

Assistant Manager was accepted. Id. at 124-25, 240; Morris dep. at 102 (Assistant Manager

could recommend termination).

### 5.     Handling Employee Disputes And Grievances

Most Store Manager Plaintiffs testified that their duties included handling and attempting

to resolve employee disputes and grievances. Smith dep. at 108; Gawor dep. at 51; Holt dep. at

113, 116; Hartzog dep. at 198, 200. Some Store Manager Plaintiffs involved their District

Manager for more serious issues, such as alleged theft. Holt dep. at 113-14. At least one

Assistant Manager Plaintiff testified that the person responsible for handling an employee

complaint or grievance was dictated by the type of complaint. Walker dep. at 219.

### 6.     Training Subordinate Employees

All Store Manager and Assistant Manager Plaintiffs admit that they trained store-level

employees.[28] Smith dep. at 188-90 (trained employees to become Assistant Managers); Gawor

dep. at 52-79 (trained employees to give good customer service), 272-73 (believed she trained

her employees well), 281-82 (provided training regarding sexual harassment and equal

---

[28] See also Rite Aid Policies and Procedures Manual at RAH-01483-88, Exhibit 56.

16

employment opportunity policies); Morris dep. at 104-05 (instructed employees and trained them in work techniques); Pittman dep. at 163 (Store Manager and/or Assistant Manager trained brand new employees); Walker dep. at 254 (provided substantial training to employees); Hartzog dep. at 244-48 (prepared training progress reports for new employees). Store Managers or Assistant Managers trained new employees, but Shift Supervisors usually did not. Pittman dep. at 68. Ultimately, the Store Manager was responsible for training new employees. Id. At least one Store Manager Plaintiff testified that some District Managers, but not others, required him to travel to other stores to train new or struggling Store Managers. Id. at 221.

### 7. Evaluating Employee Performance

Rite Aid's store-level associates are evaluated on a yearly basis. See Rite Aid Policies and Procedures Manual at RAH 01489-93, Exhibit 56. All of the Store Manager Plaintiffs testified that they prepared performance evaluations for their associates. Smith dep. at 115-16, 300; Gawor dep. at 218; Holt dep. at 260, 262, 264; Pittman dep. at 150 (prepared performance evaluations for Shift Supervisors); Walker dep. at 187; Hartzog dep. at 95, 265. In some stores, the Store Manager Plaintiffs sought input and assistance from their Assistant Managers. Hartzog dep. at 95; Walker dep. at 187. Other Store Manager Plaintiffs did not seek input or assistance from their Assistant Managers. Morris dep. at 163. Shift Supervisors were not involved in the performance evaluation process. Walker dep. at 187. In addition to formal yearly performance evaluations, the Store Manager Plaintiffs provided informal evaluations of Assistant Managers and Shift Supervisors. Pittman dep. at 224-26.

### 8. Recommending Promotions And Raises

Pursuant to Rite Aid's Shift Supervisor promotion process, Store Managers and District Managers are involved in decisions regarding promotions to Shift Supervisor. Although the

17

District Manager has the ultimate authority to decide who is promoted, Store Manager recommendations are actively sought and considered.[29] Many of the Store Manager Plaintiffs recommended employees be promoted to Shift Supervisor positions.  Smith dep. at 93-95 (recommended employees be promoted to Shift Supervisor and recommendations were always accepted); Gawor dep. at 154-55 (recommended employees be promoted to Shift Supervisor); Pittman dep. at 150 (completed performance evaluations for hourly employees, including Shift Supervisors).  At least one of the Assistant Manager Plaintiffs was promoted to Assistant Manager because of the unsolicited recommendation of her Store Manager.  Walker dep. at 148-49.  In addition, Store Managers have authority to recommend raises for employees who were doing their job well.  Smith dep. at 115.  Some District Managers sought input concerning raises for store-level employees from the Store Manager.[30]  Pittman dep. at 76-77.

### 9.    Accounting For Inventory And Merchandising

Most Store Manager and Assistant Manager Plaintiffs admit that they were responsible for accounting of inventory.  Morris dep. at 54, 169, 233; Walker dep. at 216, 256; Smith dep. at 150; Gawor dep. at 332; Holt dep. at 179; Hartzog dep. at 199; Pittman dep. at 175.  Ensuring the store has the proper amount of inventory -- determining what merchandise is selling well and what merchandise the store needs more of -- involves judgment and discretion.  Walker dep. at 256-57.  Store Managers must track the sale of merchandise and order additional merchandise as needed based upon sales.  Smith dep. at 150-51.  One Store Manager Plaintiff explained that if the store does not have the merchandise to sell, then volume could not be increased until the Store Manager picked up the phone and requested more merchandise.  Smith dep. at 153-54.

---

[29] This process is not always followed because District Managers are often too far away from stores to participate fully in selecting Shift Supervisors.  Panzer dep. at 24-25.
[30] Before 2004, Store Manager, Assistant Manager and Shift Supervisor compensation decisions were completely decentralized and all over the board.  Bailey dep. at 27, 31, 85.

Another Store Manager Plaintiff testified that he never allowed his Shift Supervisors to complete an "ad order," but another Plaintiff testified that when she was a Shift Supervisor, her Store Manager allowed her to place ad orders. Compare Pittman dep. at 175 with Walker dep. at 69-70, 190.

The Store Manager Plaintiffs were ultimately responsible for the merchandising of the store. Gawor dep. at 251. Proper merchandising of the store affects the store's sales, and contrary to Plaintiffs unsupported assertions, the Store Manager Plaintiffs were afforded discretion with respect to merchandizing.[31] As one Assistant Manager testified regarding her Store Manager, "[e]ven if it was something that did not sell good, she would normally make this dramatic display to where it would sell good. I mean she would always come up with these ideas as how to, you know, fix the stuff up to where it would sell good." Walker dep. at 91-92. According to one Store Manager "all stores is not set up alike." Holt dep. at 145. Because Rite Aid stores are not the same, Rite Aid's suggested plan-o-grams and profit planners often required the Store Manager Plaintiffs to exercise his or her discretion with regard to displaying merchandise within the store's limited physical space. Holt dep. at 145-46 (Plaintiff Holt's store was an old store and she "couldn't set the store by the profit plan" because it was too small and did not have enough end caps, which are the shelves at the end of the store aisles); Gawor dep. at 87, 89, 185.[32] Contrary to Plaintiffs' assertion in their Brief, some Store Manager and Assistant

---

[31] The five most important job duties listed by one Assistant Manager in her performance review were: 1) merchandising; 2) scheduling; 3) computer applications; 4) customer service; and 5) delegating to Shift Supervisors and Cashiers. Morris dep. at 304-05, Exhibit 10 thereto.

[32] The Store Manager Plaintiffs were afforded discretion with regard to merchandizing certain end caps, called "Manager's Choice." Pittman dep. at 214-15. A Manager's Choice end-cap may contain a beer or chip promotion, or remnants from a previous sale, "basically it was the manager's option." Pittman dep. at 214-15. The Store Manager Plaintiffs put items that they knew from experience sold well in those end caps. Walker dep. at 73-74. The Store Manager Plaintiffs could also decide to allow a direct store vendor to set up a promotional display, but "a lot depended upon the District Manager in the store you were in." Pittman dep. at 216.

Manager Plaintiffs testified that they had discretion to determine what merchandise would be sold in their stores. Walker dep. at 248, 307-08, 310 (in some stores Shift Supervisors could order but not in other stores); Pittman dep. at 174-75, 178, 215; Smith dep. at 150-51; Hartzog dep. at 197-99.

### 10. Responsibility For Customer Service

Providing customer service is an important and necessary management function that has a direct impact upon a store's sales. See Gawor dep. at 71 (taking credit for increase in store sales because of the customer service that she provided); Smith at 298 (first sentence of self-performance appraisal states her job "is to lead my store in the area of customer service"). Most Store Manager and Assistant Manager Plaintiffs admit that their management duties included spending time to ensure their employees were providing an adequate level of customer service. Walker dep. at 211, 257-58; Morris dep. at 298; Hartzog at 46-47. In addition, the Store Manager and Assistant Manager Plaintiffs were responsible for training employees regarding customer service. Smith dep. at 295-97; Gawor dep. at 79. Some Store Manager Plaintiffs also testified that it is their job to receive and resolve customer complaints. Smith dep. at 154-56; Gawor dep. at 252-53; Pittman dep. at 184, 196 (manager could modify price of merchandise to resolve customer complaint).

### 11. Preparing And Reviewing Daily, Weekly And Monthly Reports

Rite Aid Store Managers and Assistant Managers are responsible for generating, maintaining and reviewing several financial reports on daily, weekly, bi-weekly and monthly bases. See Exh. 9 to Pittman dep. at 275 (chart of the daily, weekly and monthly reporting responsibilities); see also Store Manager and Assistant Manager Job Descriptions (stating that Store Managers and Assistant Managers shall "review profit and loss (P&L) and other financial

reports"). The regular reports include the: (1) Business Day Report ("BDR"), a weekly sales report; (2) coupon recap report, a reconciliation report between coupons actually received and those received by the computer report; (3) Monthly P&L report; (4) Form 30 report, which indicates markdowns of merchandise taken at the register; (4) vendor report; (5) deposit report, which shows daily deposits that were taken to the bank; and (6) reconciliation report, a report that is printed for each cashier per shift and reflects that cashier's register activity. Smith dep. at 160, 274-77; Gawor dep. at 237; Holt dep. at 178-79; Pittman dep. at 121, 186. In some stores, the Store Manager Plaintiffs involved their Shift Supervisors in the reporting process. Walker dep. at 219-20 (stating that maintaining, reviewing and generating production and sales records could be done by Store Manager, Assistant Manager or Shift Supervisor, but varied by store).

### 12.    Balancing The Books And Making Bank Deposits

Plaintiffs do not dispute that they were responsible for ensuring that bank deposits were made. Both the Store Manager and Assistant Manager Job Descriptions state that Store Managers and Assistant Managers are "responsible of overseeing daily banking activities, including ensuring all daily deposits are taken to the bank and the appropriate amount of money is left in the store each evening." See Store Manager and Assistant Manager Job Description, Exhibits 53 and 54. Furthermore, all Store Manager and Assistant Manager Plaintiffs testified that they performed this managerial job duty. Smith dep. at 279; Gawor dep. at 53, 281; Morris dep. at 108; Holt dep. at 192; Pittman dep. at 198; Walker dep. at 243-45; Hartzog dep. at 156-57. One Store Manager Plaintiff testified that she had discretion to either take the deposit to the bank herself or delegate this job duty to other employees. Hartzog dep. at 182 (testifying that previous Store Manager would typically take the deposits to the bank, but when Hartzog was the Store Manager, she would typically delegate this duty to other employees). The Store Manager and Assistant Manager Plaintiffs were also responsible for reconciling the registers to make sure

that receipts matched the day's actual sales. See Rite Aid Policies and Procedures Manual at

RAH 01225; Gawor dep. at 53; Walker dep. at 250; Hartzog dep. at 199; Pittman dep. at 88-89,

185.

### 13.    Controlling Shrink And Receiving Merchandise

Store Managers and Assistant Managers are responsible for controlling shrink, which is

loss of inventory caused by external or internal theft.[33]  Gawor dep. at 247; Smith dep. at 161;

Morris dep. at 107; Pittman dep. at 96, 99-100, 107-08; Holt dep. at 94-95; Walker dep. at 223-

24; Panzer dep. at 145-47, 152; see also Store Manager and Assistant Manager Job Descriptions;

and exhibit 10 to Smith's dep. (shrink management tool).  Ways in which a Store Manager can

control shrink include monitoring associates shifts by computer, printing out cashier journal

reports and reviewing them for underages, determining which manager approved any price

modifications, checking employees' bags before they leave the store, checking female

employees' purses, and keeping an eye out for potential shoplifters and suspicious associates.

Smith dep. at 161-62.  Shrink varies significantly by store location and can have an impact on a

Store Manager's hours worked and job duties.  Pittman dep. at 96, 103-04, 212.

The Store Manager Plaintiffs testified that it was also their responsibility to oversee the

receipt of merchandise and ensure warehouse and direct vendor shipments were properly

processed and distributed.  Smith dep. at 260-61; Gawor dep. at 323; Morris dep. at 54, 170-71,

245; Pittman dep. at 213-14.  Products received must be accurately reflected in the paperwork

describing the incoming shipment, placed on shelves in a timely manner, and removed when

---

[33] Although Plaintiffs assert that they had little control over cash in the store and were limited as to cash variances, two Plaintiffs exercised the managerial discretion afforded to them to steal money, and were ultimately terminated for theft.  Plaintiff Hartzog was terminated for stealing $9,604.40.  See Exhibit 23 to Hartzog dep. (signed confession).  Plaintiff Walker was terminated for stealing $1,300.  See Exhibit 6 to Walker dep. (signed confession).

expired. Id. Different Store Manager Plaintiffs viewed the Store Manager's role with respect to receiving merchandise in different ways. Compare Hartzog dep. at 192 with Pittman dep. at 213.

### 14.    Documenting And Reporting Incidents And Accidents

Rite Aid Store Managers and Assistant Managers are responsible for completing incident and accident reports and conducting accident investigations. Pittman dep. at 101-03, 193-94; Gawor dep. at 235; see also Rite Aid Store Operations Manual at RAH-01919, 01970-71, Exhibit 57. One Store Manager Plaintiff admits she completed an accident report when a customer slipped and fell.[34]  Smith dep. at 201. Furthermore, if a cashier witnessed a customer stealing, the cashier would report the incident to the manager on duty. Pittman at 101-03. The manager on duty would then approach the individual, try to recover the merchandise, and detain the shoplifter in the store until the police arrived. Pittman dep. at 101-03. Afterwards, the manager would fill out an incident report and sign and aid in completing any necessary police report. Pittman at 101-03. Also, if an employee was injured on the job, the Store Manager was responsible for completing all necessary paperwork. Rite Aid Store Operations Manual at RAH-01953, Exhibit 57.

### 15.    Completing Paperwork on a Daily Basis

Most Store Manager and Assistant Manager Plaintiffs testified that they completed paperwork on a daily basis. Gawor dep. at 53 (completed paperwork on a daily basis); Holt dep. at 178 (completed paperwork on a daily basis); Hartzog dep. at 200 (completed paperwork on a daily basis); Walker dep. at 226-27 (Assistant Manager completed paperwork on a daily basis);

---

[34] The Store Manager and Assistant Manager Plaintiffs admit they were responsible for ensuring that company policies were communicated and followed by store personnel and that the store environment was safe for customers and employees. Smith dep. at 170, 194, 202, 258, 288; Hartzog dep. at 198-99; Morris dep. at 67-68, 107. The Store Manager Plaintiffs were responsible for conducting monthly safety meetings and reviewing all safety rules with new hires. See Rite Aid Store Operations Manual at RAH-01943, Exhibit 57; Pittman dep. at 194.

Morris dep. at 148 (one of Assistant Manager Morris's skill sets was the ability to keep the office organized clean efficient and to do paperwork). In fact, one Store Manager Plaintiff testified that he would evaluate his Assistant Managers based upon the completeness of their office paperwork. Pittman dep. at 224. The completion of paperwork was managerial work. Gawor dep. at 386-87.

### 16.    Attending District And Regional Meetings

Store Managers attended monthly District meetings and annual Regional meetings. Gawor dep. at 281; Holt dep. at 231-32; Pittman dep. at 140. After the meetings, the Store Manager Plaintiffs discussed the information provided to them at meetings with their store employees. Holt at 233-34; Pittman dep. at 142-43. In addition, some Store Manager Plaintiffs conducted monthly meetings in their stores. Holt dep. at 233; Morris dep. at 321.

## III.    LEGAL ANALYSIS

The record and applicable legal precedent do not support Plaintiffs' request for conditional certification and Court authorized notice pursuant to § 216(b) of the FLSA. See 29 U.S.C. § 216(b).[35] Plaintiffs' highly individualized claims (which are subject to individual defenses and require individual factual inquiry) do not lend themselves to §216(b) treatment and render Plaintiffs unable to carry their burden of satisfying any of the requirements for conditional certification. Accordingly, the Court should deny Plaintiffs' request for conditional certification and refuse to send notice to Defendant's Store Managers or Assistant Managers.

---

[35] Specifically, §216(b) provides that an action may be brought "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated," but "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the Court in which such action is brought." 29 U.S.C. § 216(b) (2000).

## A.   THE STANDARD FOR A COLLECTIVE ACTION UNDER SECTION 216(b)

Although courts have discretionary power to authorize the sending of notice to potential

class members in a collective action brought under Section 216(b), this power must "be

exercised with discretion and only in appropriate cases." Horne v. United Servs. Auto. Ass'n,

279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003) (citing Haynes v. Singer Co., 696 F.2d 884, 886

(11th Cir. 1983)); see also Hoffmann-LaRoche, Inc. v. Sperling, 493 U.S. 165, 169-70 (1989)

(confirming the existence of the district court's discretion to send notice, not the details of its

exercise); Hall v. Burk, No. 301CV2487H, 2002 WL 413901, at *2 (N.D. Tex. Mar. 11, 2002)

("District Courts have discretion to authorize notice to similarly situated employees that they

may opt-in as a class, but that notice is by no means mandatory."); Bernard v. Household Int'l,

231 F. Supp. 2d 433, 435 (E.D. Va. 2002) (same); Watts v. Marion County, No. 94-1428, 1995

WL 264189, at *1 (D. Or. May 1, 1995) (same). A collective action should be permitted to

proceed only where it facilitates a court's ability to resolve efficiently multiple claims in one

proceeding. Sperling, 490 U.S. at 170.

Before conditionally certifying a collective action and authorizing notice,[36] the Court

must "'satisfy itself that there are other employees who desire to "opt-in" and who are "similarly

---

[36] The Eleventh Circuit suggests that district courts use a two stage *ad hoc* approach when deciding whether to certify a collective action. Hipp v. Liberty Nat'l Ins. Co., 252 F.3d 1208, 1218 (11th Cir. 2001) (per curiam), cert. denied, 534 U.S. 1127 (2002); Reed v. Mobile County School Sys., 246 F. Supp. 2d 1227, 1230 (S.D. Ala. 2003) (explaining that the two-tiered approach is a "suggestion, not a requirement") (citation omitted).  During the initial "notice" stage, courts determine whether they should conditionally certify a class and permit notice to be sent to potential class members. Hipp, 252 F.3d at 1218; Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214 (5th Cir. 1995). A conditional certification at the notice stage is not, however, a determination on the merits of the plaintiffs' claims, which may be challenged after further discovery. Grayson v. K Mart Corp., 79 F.3d 1086, 1096 n.12 (11th Cir. 1996). The second "decertification" stage, which generally occurs after discovery is complete, involves a more rigorous, factual determination of whether the potential plaintiffs are actually "similarly situated" after the

situated" with respect to their job requirements and with regard to their pay provisions.'" White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1312 (M.D. Ala. 2002) (quoting Dybach v. Florida Dep't of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991)); see also Horne, 279 F. Supp. 2d at 1234. This preliminary inquiry is necessary, because "courts, as well as practicing attorneys, have a responsibility to avoid the '*stirring up*' of litigation through unwarranted solicitation." Severtson v. Phillips Bev. Co., 137 F.R.D. 264, 266-67 (D. Minn. 1991) (emphasis added); see also White, 204 F. Supp. 2d at 1318; Brooks v. BellSouth Telecomms., Inc., 164 F.R.D. 561, 567 (N.D. Ala. 1995), aff'd, 114 F.3d 1202 (11th Cir. 1997). Further, "an employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense." D'Anna v. M/A-COM, Inc., 903 F. Supp. 889, 894 (D. Md. 1995). The record evidence fails to establish either of the prerequisites to conditional certification. Rather, it demonstrates that the Court would face individual claims requiring fact-specific determinations relating to the hodge-podge of job duties performed by each Plaintiff and potential opt-in.

The conditional certification decision is generally made early in the litigation process, prior to extensive discovery, using a "fairly lenient" standard. See, e.g., Grayson, 79 F. 3d at 1097. The rationale for applying a "fairly lenient" standard at the conditional certification stage is that during the "early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence." Davis v. Charoen Pokphand (USA), Inc., 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004). Once plaintiffs have had an opportunity to conduct discovery concerning a defendant's policies and procedures, the rationale, corresponding need for, and application of the more lenient standard is no longer applicable. Id.; see also White, 204 F.

---

court has information from the discovery process. If the court finds a lack of similarity at this stage, it will decertify the collective action and the original named plaintiffs will proceed to trial with only their individual claims. Hipp, 252 F.3d at 1218. Although this matter is currently at the notice stage, the extensive discovery conducted to date demonstrates that collective treatment is not warranted.

Supp. 2d at 1310 n.2 (finding "lenient standard" inapplicable after extensive discovery and "carefully considering the submissions of the parties with respect to the class allegations, rather than merely relying on the handful of affidavits that support [plaintiffs' position]"); Morisky v. Public Serv. E&G Co., 111 F. Supp. 2d 493, 498-99 (D.N.J. 2000); Brooks, 164 F.R.D. at 568-69 (requiring more than a "fairly lenient standard" after three months of discovery).

Although Plaintiffs correctly note that in some cases plaintiffs may carry their burden of proof with only allegations in their complaint and declaration, see Plaintiffs' brief at 18, this case is in a dramatically different posture, and "a more searching standard of review is appropriate." See Davis, 303 F. Supp. 2d at 1276. The parties have conducted six months of discovery. Specifically, Plaintiffs have conducted extensive discovery regarding, among other things, Defendant's policies and practices. Plaintiffs served, and Defendants responded to, two sets of interrogatories and four sets of requests for production of documents. See Plaintiffs' written discovery requests and Defendant's responses thereto, Exhibits 59 through 62. Defendants have produced more than seven thousand (7,000) pages of documents. Plaintiffs deposed Defendant's corporate representative(s) (a total of five witnesses), pursuant to Fed. R. Civ. P. 30(b)(6), over a three-day period regarding topics including the job duties of Store Managers, Assistant Managers, and Shift Supervisors and "hiring, discipline and termination policies."[37] See Plaintiffs' Notice of Rule 30(b)(6) Deposition and Defendants' Objections and Responses thereto, Exhibits 59 and 60, respectively. Plaintiffs have enjoyed more than an ample opportunity to conduct discovery into Defendant's policies and practices. Although Plaintiffs clearly prefer that the Court not analyze the facts and abundant deposition testimony in the case, the Court should not apply the lenient pre-discovery standard in light of this extensive discovery.

---

[37] Defendant served written discovery requests on each Plaintiff and has deposed each Plaintiff, except Marty Cooper, who apparently no longer wishes to participate in this action and whose claims are the subject of a Motion to Dismiss.

At this point in the litigation, Plaintiffs are required to marshal their evidence or concede the evidence does not fit their broad, vague and over-simplified theory of the case. As demonstrated herein, Plaintiffs' form declarations, which are directly contradicted by their deposition testimony, and the absence of any compelling evidence fail to carry the day.[38]

**B.    PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN OF PROOF TO DEMONSTRATE SIMILARLY SITUATED EMPLOYEES SEEK TO OPT IN**

The first inquiry in granting conditional certification is "whether plaintiffs have shown that other employees <u>desire</u> to opt into this litigation." <u>Davis</u>, 303 F. Supp. 2d at 1276 (emphasis added). Plaintiffs bear the burden of demonstrating a reasonable basis for crediting the assertion that aggrieved individuals exist in the class they propose. See <u>Marsh v. Butler County School Sys.</u>, 242 F. Supp. 2d 1086, 1091 (M.D. Ala. 2002) (citing <u>Haynes</u>, 696 F.2d at 887). Plaintiffs have confused their burden and assert that they need to prove only that other allegedly similarly situated employees "<u>may</u> desire to opt in." See Plaintiffs' brief at 20-21. Nevertheless, "[c]ourts have been clear ... that a plaintiff's mere stated belief in the existence of other employees who desire to opt in is insufficient," <u>Horne</u>, 279 F. Supp. 2d at 1236, and that "unsupported expectations that additional plaintiffs will subsequently come forward" are also insufficient. <u>Mackenzie v. Kindred Hosps. East</u>, 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003). "[P]laintiffs must introduce more than their own statements that other potential class members exist." <u>Davis</u>, 303 F. Supp. 2d at 1276 (citing <u>Horne</u>, 279 F. Supp. 2d at 1236).

Plaintiffs seek conditional certification on a wing and a prayer that other employees in the purported class they seek to represent "<u>may</u>" be interested in opting into this litigation. See

---

[38] Even if Plaintiffs' form declarations provided sufficient evidence to demonstrate that some Store Managers and Assistant Managers are similarly situated, those declarations come from individuals in only two limited geographic areas (Southern Alabama and Southern Mississippi). Those two areas are located in only two Districts, which are both in one Region. As discussed below, Plaintiffs' evidence is far from sufficient to justify nationwide notice.

Plaintiffs' Brief at 20. Despite extensive efforts to recruit and solicit current and former Store Managers and Assistant Managers to participate in the purported collective action, the four original Plaintiffs have been unable to identify any meaningful number of potential class members who desire to opt into this litigation.[39] Only a total of eleven employees[40] (including the original four Plaintiffs) have expressed a desire to participate in this action. The former Assistant Managers who have expressed a desire to participate in this case (Plaintiff Morris, an original Plaintiff, and two Plaintiffs who were added by amendment, Walker and Hartzog (who was also a Store Manager)) worked in five stores in two districts and cannot support notice to more than 6,000 Assistant Managers in twenty-eight (28) states. Similarly, the seven Store Managers identified by Plaintiffs are insufficient to carry their burden of proof as to justify notice to more than 6,000 Store Managers in twenty-eight (28) states. Compare Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358, 364 (M.D. Ala. 1999) (finding sufficient showing for notice to employees in one location when the seven named plaintiffs produced twenty-one affidavits of hourly wage employees of a single restaurant); Reed, 246 F. Supp. 2d at 1231 (court

---

[39] Plaintiffs Pittman and Hartzog saw advertisements in Mississippi newspapers (a Jackson paper and the Clarian Ledger) requesting that Store Managers and Assistant Managers interested in suing Rite Aid call Plaintiffs' counsel. Pittman dep. at 255-57; Hartzog dep. at 317. Plaintiff Smith was approached by Plaintiff Holt and solicited to become involved. Holt dep. at 162-63. Plaintiff Morris was contacted directly by Plaintiffs' counsel, Johnnie Smith, and asked if she would like to become involved. Smith dep. at 192-93. Defendant has requested in written discovery that Plaintiffs produce information relating to their efforts to solicit clients through the media and otherwise, and to provide, among other things, information concerning the number of people who have indicated that they do not wish to participate. See Plaintiffs' Responses to Defendants' First Set of Global Interrogatories and Requests for Production, Exhibit 63. Plaintiffs have objected and refused to produce the requested information and documents. Id. Plaintiffs' refusal to produce this information will be the subject of a motion to compel should any class be conditionally certified.

[40] There are four original Plaintiffs (three Store Managers and one Assistant Manager) and seven opt-ins (six Store Managers, one of whom was an Assistant Manager for a short period of time, and one Assistant Manager). One of those eleven (11) people – Plaintiff Marty Cooper – has now effectively abandoned his case. Plaintiff Cooper's claims are currently the subject of a Motion to Dismiss for failure to respond to written discovery or appear to be deposed. Plaintiff Cooper's abandonment of the case reveals his disinterest in proceeding with this litigation and leaves Plaintiff with only ten (10) employees (nine of whom are former employees) who have expressed any interest in participating in this litigation.

found sufficient evidence that other employees wished to opt-in where plaintiffs produced over eighty (80) opt-in consent forms); with H&R Block v. Housden, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (unsupported allegations of widespread FLSA violations by two plaintiffs insufficient).

Moreover, Plaintiffs submit testimony from only six of the eleven individuals who have expressed a desire to participate in this lawsuit,[41] and Plaintiffs' testimony demonstrates that their former co-workers do not want to participate. Plaintiffs Holt, Pittman, and Gawor testified that they spoke with potential class members who declined to participate. Holt dep. at 166-68; Pittman dep. at 260; Gawor dep. at 265. Other Plaintiffs have testified that they are not aware of any other employees who have expressed an interest to participate in this lawsuit. Hartzog dep. at 311-12; Morris dep. at 195.

By failing to meet this initial burden, Plaintiffs fail to demonstrate any basis for the Court to permit this litigation to proceed as a collective action. The Court should therefore deny Plaintiffs' Motion.

## C.    PLAINTIFFS ARE NOT SIMILARLY SITUATED TO ONE ANOTHER, LET ALONE A CLASS OF THOUSANDS OF FORMER AND CURRENT STORE MANAGERS AND ASSISTANT MANAGERS

An equally glaring defect in Plaintiffs' motion for conditional certification is Plaintiffs' inability to demonstrate that other Rite Aid Store Managers and Assistant Managers are similarly situated to them within the meaning of Section 216(b). Not only have Plaintiffs failed to establish that the other employees in the sought class are similarly situated, Plaintiffs are not similarly situated to one another.

---

[41] Plaintiffs filed Consent to Become Party Plaintiff forms from three individuals who allegedly work or worked as Store Managers. However, Plaintiffs present no evidence from these individuals upon which the Court could determine they are similarly situated to Plaintiffs.

30

### 1.    Plaintiffs' Burden Of Proof And The Applicable Standard Of Review

Plaintiffs bear the burden of demonstrating that they and other employees in the purported class are similarly situated. See Marsh, 242 F. Supp. 2d at 1091; see also Haynes, 696 F.2d at 887; Horne, 279 F. Supp. 2d at 1234; Harper, 185 F.R.D. at 362. Plaintiffs must submit evidence establishing at least a colorable basis to support their claim that a class of similarly situated plaintiffs exists. Brooks, 164 F.R.D. at 567.

### a.    Methods of proving other employees are similarly situated

This Court has recognized two means by which plaintiffs who seek conditional certification of an FLSA collective action may meet their burden of proof with respect to the similarly situated requirement. See Barron v. Henry County School Sys., 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003); Marsh, 242 F. Supp. 2d at 1092. Initially, plaintiffs may carry their burden of proof by demonstrating that a defendant had some particular uniform common policy, plan, or scheme that created a pattern and practice of alleged violations. See Barron, 242 F. Supp. 2d at 1104; see also Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (requiring a *factual* showing sufficient to demonstrate that they and potential plaintiffs together were victims of a *common policy or plan that violated the law*") (emphasis added); Heagney v. European Am. Bank, 122 F.R.D. 125, 127 (E.D.N.Y. 1988). "While plaintiffs certainly are not required to prove by a preponderance of the evidence a pattern and practice at the notice stage, because there is no requirement of a motivating discriminating animus in an FLSA case [unlike in an ADEA case], a pattern in such a case must stem from some other formal or informal policy or practice." Barron, 242 F. Supp. 2d at 1104. In other words, an FLSA collective action may not be brought if it arises from circumstances purely personal to the named plaintiffs, rather than

from a generally applicable policy or action of the defendant's. See generally, Brooks, 164

F.R.D. at 569 ("it is clear that any claims of the proposed opt-in plaintiffs would present

disparate factual and employment settings"); Tucker v. Labor Leasing, Inc., 872 F. Supp. 941,

947-49 (M.D. Fla. 1994) (requiring common policy); Burt v. Manville Sales Corp., 116 F.R.D.

276, 277 (D. Colo. 1987).

    If plaintiffs proceed under a pattern and practice theory, they "must prove that the

discrimination was the company's standard operating procedure." Marsh, 242 F. Supp. 2d at

1093. To meet this burden, a plaintiff must do more than prove the occurrence of isolated or

sporadic discriminatory acts. Id. (citing Hipp, 252 F.3d at 1227-28).

> [T]he mere fact that [alleged] violations occurred cannot be enough to
> establish similarity, as that would not ultimately be sufficient to
> establish a pattern and practice without a showing that the violations
> were more than sporadic occurrences. To conclude otherwise, that is,
> to conclude that it is enough to demonstrate that employees are
> similarly situated simply to say that they claim violations of the law by
> the same employer, would be to conclude that any time an employer
> had two or more employees who allegedly were not being paid the
> overtime they claimed they were due, the employees would be
> similarly situated and be allowed to proceed with a collective action.

Barron, 242 F. Supp. 2d at 1104 (footnote omitted). "[T]he remedy in § 216(b) is an attempt by

Congress to balance the competing policies of strict enforcement of the statutory objective of

insuring minimally acceptable pay levels and the avoidance of economic disruption of

unanticipated liabilities. It seems to this court that allowing collective actions to proceed based

solely upon the mere fact that more than one employee complains of having been denied

overtime, without an identification of some policy, would upset this balance." Barron, 242 F.

Supp. 2d at 1103 n.4 (citing Lerwill v. Inflight Motion Pictures, Inc., 343 F. Supp. 1027, 1029

(N.D. Cal. 1972)); see also Mielke v. Laidlaw Transit, Inc., No. 00-C-669, 2004 WL 443985, at

*3 (N.D. Ill. Mar. 4, 2004) (recognizing that absent a uniform policy or decision, "the individuals

in Plaintiffs' proposed collective action have disparate factual and employment settings"). In

Harper, 185 F.R.D. at 364, for example, this Court found evidence that a discrete group of

employees in a single restaurant were similarly situated based on an alleged pattern of violations

caused by two of the employer's policies: (1) requiring servers to perform additional tasks

outside of their job requirements, and (2) management employees clocking out workers without

authorization. Cf. Marsh, 242 F. Supp. 2d at 1094 (allegations that violations were caused by a

"policy of knowingly and purposefully failing to pay overtime wages" were insufficient to

establish employees were similarly situated).

Plaintiffs may also establish that other employees are similarly situated "without pointing

to a particular plan or policy." Barron, 242 F. Supp. 2d at 1103. To do so, however, Plaintiffs

must make some "rudimentary showing of commonality between the basis for [their] claims and

that of the potential claims of the proposed class, beyond the mere facts of job duties and pay

provisions, because without such a requirement, it is doubtful that § 216(b) would further the

interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse."

Horne, 279 F. Supp. 2d at 1234 (citing White, 204 F. Supp. 2d at 1309); Barron, 242 F. Supp. 2d

at 1103; Marsh, 242 F. Supp. 2d at 1093. "[S]ome identifiable facts or legal nexus must bind the

claims so that hearing the cases together promotes judicial efficiency." Barron, 242 F. Supp. 2d

at 1103 (citing Sheffield v. Orius Corp. 211 F.R.D. 411, 416 (D. Or. 2002)).

### b.   Plaintiffs fail to demonstrate a uniform policy, plan or scheme that created a pattern or practice of alleged violations

Plaintiffs do not identify any common formal or even informal policy or procedure that

caused the alleged violations. Rather, Plaintiffs seek to send notice to Store Managers and

Assistant Managers "who were subject to Rite Aid's uniform policy of not paying overtime

compensation." See Plaintiffs' Brief at 2. Plaintiffs' brief discussion (two lines) and vague

allegations that their store budgets were too low to permit non-exempt employees to work

enough hours to perform all the necessary non-management tasks and that non-exempt

employees were not permitted to work overtime are not sufficient evidence of a common policy,

plan or scheme. See Plaintiffs' Brief at 8-9. These allegations, even if true, do not establish a

policy, plan or scheme that caused the alleged violations. The critical issue remains whether the

job duties Plaintiffs allegedly performed were similar, i.e., the Court must still analyze each

Plaintiffs' job duties and compare them to the individual job duties of each Store Manager and

Assistant Manager to determine if they are in fact similar.

Rite Aid's store level labor budgets are fully adequate to allow Store Managers and

Assistant Managers to staff their stores so that they can perform their managerial functions.[42]

Panzer dec. at ¶ 9. Plaintiffs admit that store budgets vary and are set store-by-store. Morris

dep. at 112-13, 345-46; Pittman dep. at 111-12; Gawor dep. at 112; see also Panzer dep. at 95;

Markley dep. at 20-21, 27. Labor plans (the number of hours that can be assigned to a store in a

given month or the dollar amount allocated for staffing a store for the month) are developed once

a year and are based on each individual store; the budget takes into account every employee in

the store and employees' individual pay rates. Silsby dep. at 39-40. The labor plan for any

particular store, which is part of the store's overall profit and loss budget, is established by the

Store Manager, the District Manager, and the Regional Vice President, up to the Division and

then up to corporate. Panzer dep. at 95. The labor plan takes into account the guidelines of the

---

[42] The record evidence also demonstrates that the manner in which store budgets were set changed during the relevant period. Prior to the implementation of Staffworks, store budgets were usually set by the Store Managers and District Managers using various methods, depending on the District where the store was located. Panzer dec. at ¶ 10. District Managers, in consultation with Store Managers, determined the store budget, including the labor budget, for each of the stores within their Districts. The manner in which and factors used by each District Manager to establish the budgets for stores within their Districts varied. Panzer dec. at 10.

store's attributes and staffing levels required for each individual store.[43] Panzer dep. at 95. Compliance with a store's payroll budget is not measured by individual labor hours used. Silsby dep. at 65-67. Store Managers have discretion to use more or fewer hours than their allotted payroll budget for business necessity. Id. at 32-33; Markley dep. at 40-41.

Even if Plaintiffs could somehow assert that their budgets created a common plan that created violations, they do not allege that the store budgets are the sole cause of any alleged violations. See, e.g., Horne, 279 F. Supp. 2d at 1235 (plaintiff's allegations concerning production goals requiring him to work overtime did not establish pattern or practice because production goals were not alleged to be sole cause of violations). Accordingly, Plaintiffs cannot demonstrate that they sustained an injury from one alleged, but not proven, common policy.

Similarly, Plaintiffs claims regarding their alleged inability to use overtime, even if true, fail to even suggest an unlawful policy. See Ray v. Motel 6 Operating LP, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996) ("[I]n that [plaintiffs] also allege that budget plans demonstrate a need for improper overtime, it is notable that the budgetary plans differ according to region and property. The evidence does not indicate that all the [plaintiffs] sustained injury from one unlawful policy."). In particular, Plaintiffs grossly mischaracterize the testimony regarding use of overtime. Contrary to Plaintiffs' assertions, Mark Panzer and Bob Silsby both testified that non-exempt employees were permitted to work overtime at the Store Manager or Assistant Manager's discretion. Panzer dep. at 196-97; Silsby dep. at 32-33. Moreover, Plaintiffs admit that although overtime was discouraged, Company policy did not prohibit it. Hartzog dep. at 267; Pittman dep. at 233-34 (District Manager approved overtime for Shift

---

[43] Plaintiffs falsely imply that Defendant has performed studies regarding the job duties performed by individuals holding particular positions and applied them to all individuals in similar positions. See Plaintiffs Brief at 6. Defendant conducted observations regarding the time needed to complete specific manual tasks, such as placing items on shelves. Markley dep. at 14-15. The observations were not job specific and did not include management tasks, such as those performed by Plaintiffs. Id. at 10.

Supervisor). If any Store Manager or Assistant Manager Plaintiffs were prohibited from using overtime, it was unique to individual District Managers who supervised them. See Plaintiffs' Declarations at ¶ 4; Gawor dep. at 432 (unidentified District Manager told her employees were not permitted to work overtime). There is no evidence of a Company-wide policy that prevents the use of overtime, and Plaintiffs cannot establish that notice should be issued on the basis of alleged policies unique to their supervisors. See Horne, 279 F. Supp. 2d at 1236. Similarly, Plaintiffs' allegation that they would be reprimanded if they exceeded their budgets is not supported by the record evidence and is not Company policy. Panzer dep. at 196-99. Accordingly, to the extent that there is any validity to this allegation, it is unique to Plaintiffs' individual work experiences.

### c. Plaintiffs' and the potential opt-ins' fact-specific claims would not further judicial economy

Plaintiffs also fail to demonstrate a common legal or factual nexus between the basis for their claims and the claims of the proposed class, beyond the mere facts of job duties and pay provisions, such that the proposed collective action would further the interests of judicial economy and efficiency. Indeed, Plaintiffs do not clearly define or articulate how they are allegedly similarly situated to the more than twelve thousand (12,000) Store Managers and Assistant Managers in twenty-eight (28) states whom they seek to send notice.

Although far from a model of clarity, it appears that Plaintiffs' sole argument is that because they are classified as exempt, allegedly performed a hodge-podge of job duties, and the "majority" of their job duties were allegedly non-managerial, other Store Managers and Assistant Managers must be similarly situated. See Plaintiffs' Brief at 6, 9. Once the smoke and mirrors are removed, Plaintiffs' theory is ultimately based on nothing more than an allegation that all Store Managers and Assistant Managers perform similar job duties. Plaintiffs have not presented

even a "rudimentary showing of commonality" between their claims and those of the potential class members. Their theory requires individualized analysis of the job duties performed by each Store Manager and Assistant Manager and would result in fact-intensive inquiries that are not proper for collective treatment.

### d. Plaintiffs are not similarly situated to other Store Managers and Assistant Managers

On its face, Plaintiffs' theory of liability requires a factual analysis of each Plaintiff's job duties to determine whether an alleged violation exists. Plaintiffs' theory requires the Court to make a leap of faith and conclude that because Plaintiffs allegedly spent more than fifty percent (50%) of their time of performing "non-managerial" duties, all Store Managers and Assistant Managers in twenty-eight (28) states must also do so. Plaintiffs' theory fails to establish even a rudimentary common factual or legal nexus between their claims and those of the potential class members. The necessary factual inquiry to determine this initial element of their claims requires the Court to consider, at a minimum, the following: (1) the actual job duties performed by each individual Store Manager and/or Assistant Manager on a daily, weekly, and monthly basis; (2) the amount of time spent by each individual on each identified job duty; (3) whether each job duty performed is managerial or non-managerial;[44] and (4) the total percentage of time spent performing managerial, as opposed to non-managerial, duties. Burying the Court in these highly individualized factual inquiries does not further the interest of judicial economy and is incompatible with the community of interest requirement for collective treatment.

---

[44] Although Plaintiffs gloss over this issue and imply that it is always a straightforward inquiry, nothing could be further from the truth. Many Plaintiffs testified that they often performed duties that would normally be considered non-managerial while training employees and leading by example, that is, showing their employees that they were willing to perform any job they would ask their employees to perform. See Smith dep. at 145, 148 (stating she got employees to work by working with them); Holt dep. at 210 (led employees by example); see also Section II, D, 6 supra at p. 16-17. Even purportedly non-managerial tasks can be managerial tasks if performed to train or lead employees.

37

Plaintiffs are not challenging Defendant's determination that the Store Manager and
Assistant Manager positions (if performed as specified in the job descriptions and other company
documents) are exempt under the FLSA. Rather, they seek a determination that the specific job
duties individual Store Managers and Assistant Managers performed rendered them non-exempt
employees. Although Plaintiffs implicitly assert otherwise, under their theory, the proper inquiry
is not whether a particular "job" category (e.g., Store Manager) is exempt or non-exempt.

The regulations specifically provide that "the exempt or non-exempt status of any
particular employee must be determined on the basis of whether his duties, responsibilities and
salary meet all the requirements of the appropriate section of the regulations...." 29 C.F.R.
§ 542.201(b)(2). Thus, "[t]o determine which employees are entitled to overtime compensation
under the FLSA depends on an individual, fact-specific analysis of each employee's job
responsibilities under the relevant statutory exemption criteria." Morisky, 111 F. Supp. 2d at
498; see also Ale v. Tennessee Valley Auth., 269 F.3d 680, 689 (6th Cir. 2001) (determination of
whether a group of employees is exempt or non-exempt based on the types of tasks performed
requires the court to focus on the relevant exemption and each employee's actual job duties);
Anderson v. City of Cleveland, 90 F. Supp. 2d 906, 916-17 (E.D. Tenn. 2000) ("the character,
type, and extent of activities and duties performed by employees plays the primary role in any
decision regarding the applicability of the exemption"); Mike v. Safeco Ins. Co. of Am., 274 F.
Supp. 2d 216, 220 (D. Conn. 2003) ("Determining whether an employee is exempt is extremely
individual and fact-intensive, requiring 'a detailed analysis of the time spent performing
administrative duties' and 'a careful factual analysis of the full range of the employee's job
duties and responsibilities.'") (quoting Cooke v. General Dynamics Corp., 993 F. Supp. 56, 59-
61 (D. Conn. 1997). If the ultimate issue to be determined is whether each employee was

properly classified as exempt, the "similarly situated" requirement in this case must be analyzed in terms of the nature of the job duties performed by each potential class member. Plaintiffs cannot carry their burden of proof by relying on their own testimony that they performed different job duties for varying amounts of time that are alleged to be non-exempt.

### i.    Plaintiffs' purported FLSA violation cannot possibly be considered collectively

Employees "employed in a bona fide executive capacity" are exempt from the FLSA's overtime provisions. See 29 U.S.C. § 213(a)(1). The Department of Labor regulations set forth both a "short" and a "long" test for determining whether an employee falls within the executive exemption. See 29 C.F.R. 541.19(a). The short test is used for professional employees who are compensated at a rate of at least $250 per week. It is undisputed Rite Aid's Store Managers and Assistant Managers earn more than $250 per week. Accordingly, the short test is the proper method for evaluating whether Plaintiffs are properly classified as exempt professionals. To satisfy the short test, the employee must:

- Receive a salary of at least $250 weekly; and

- Have the primary duty of managing the enterprise, department, or subdivision of the company and customarily and regularly direct the work of two or more employees.

29 C.F.R. § 541.119(a) (emphasis added).

Plaintiffs do not dispute that they regularly supervise two or more employees.[45]

Accordingly, the only issue presented is whether management is Plaintiffs' "primary duty."[46]

_____

[45] Plaintiffs assert, with no evidentiary support, that Pharmacists "oversee the Pharmacy and its employees." See Plaintiffs' Brief at 4 n.5. The record evidence demonstrates that, in addition to supervising front-end employees (Cashiers and Shift Supervisors), Rite Aid's Store Managers and Assistant Managers also supervise pharmacy employees. Walker dep. at 155-56, 199 (had supervisory and disciplinary authority over pharmacy personnel); Hartzog dep. at 119-20, 125-26, 205, 217-18 (interviewed, supervised and disciplined pharmacy personnel); Morris dep. at 221 (had authority to discipline pharmacy employees for not following rules). Accordingly, there is no legitimate dispute that

Plaintiffs have presented no evidence that demonstrates they, much less the potential class members, were subjected to a violation of the FLSA.[47]  Plaintiffs seek to certify a nationwide purported collective action without even alleging (and in no way substantiating) that Rite Aid has committed a violation of the FLSA that could possibly be common to all putative class members. They ultimately assert only that they performed non-managerial tasks more than fifty percent (50%) of the time and list a few job duties they allegedly did not perform.  Plaintiffs' claims, even if true, do not establish a violation of the FLSA.

Numerous courts have held that Store Managers in retail settings are exempt even if they perform non-managerial work. Murray v. Stuckey's Inc., 939 F.2d 614, 618 (8th Cir. 1991) ("Murray I") (recognizing the fact that a manager spent ninety percent (90%) of his time on non-managerial duties was "not a controlling factor under the regulations"); see also Thomas v. Jones Restaurants, Inc., 64 F. Supp. 2d 1205 (M.D. Ala. 1999); Murray v. Stuckey's Inc., 50 F.3d 564 (8th Cir. 1995) ("Murray II"); Stricker v. Eastern Off Road Equipment, Inc., 935 F. Supp. 650 (D. Md. 1996) (manager of truck and off-road vehicle equipment retail outlet store properly classified as exempt); Meyer v. Worsley Cos., 881 F. Supp. 1014, 1017-21 (E.D.N.C. 1994)

---

Rite Aid's Store Managers and Assistant Managers continuously and regularly direct the work of two or more employees.

[46] Each Rite Aid store is a distinct entity or division.  Although there are common methods of operation, each store stands on its own.  See Panzer dec. at 4.  See Cowan v. Treetop Enters., Inc., 120 F. Supp. 2d 672 (M.D. Tenn. 1999).

[47] The relevant Regulation describes "management" duties as follows:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be brought, stocked or sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property."

29 C.F.R. § 541.102(b).

(Scottsmen convenience store manager); <u>Sturm v. TOC Retail, Inc.</u>, 864 F. Supp. 1346 (1994)
(convenience store manager "in charge" and thus exempt; percentage of time spent performing
non-managerial tasks is irrelevant in convenience store (retail) setting); <u>Glefke v. KFC Take
Home Food Co.</u>, No. 92-74371, 1993 WL 521993, at **4-5 (E.D. Mich. Aug. 27, 1993)
(restaurant manager exempt despite performing non-managerial tasks); <u>Horne v. Crown Cent.
Petroleum, Inc.</u>, 775 F. Supp. 189 (D.S.C. 1991) (manager of convenience store properly
classified as exempt); <u>Donovan v. Waffle House, Inc.</u>, No. C81-609A, 1983 WL 2108, at *8-9
(M.D. Ga. Sep. 26, 1983).

    Similarly, numerous courts have held that Assistant Managers in retail settings are
exempt even if they perform non-managerial work.  See <u>In re Food Lion, Inc.</u>, No. 94-2360,
1998 WL 322682 (4th Cir. Jun. 4, 1998) (per curiam) (holding assistant manager who was in
sole charge of store for about one-half of his working hours was exempt even though the
assistant manager spent some time performing non-exempt duties such as stocking the shelves
and unloading grocery trucks; also noting that the fact that some non-exempt employees
performed some managerial functions did not destroy exemption); <u>Donovan v. Burger King
Corp.</u>, 675 F.2d 516, 521 (2d Cir. 1982) ("Burger King II") (finding that assistant managers who
spent the majority of their time performing the same work as hourly employees were
nevertheless exempt; "the person 'in charge' of a store has management as his primary duty,
even though he spends the majority of his time on non-exempt work and makes few significant
decisions"); <u>Donovan v. Burger King Corp.</u>, 672 F.2d 221, 227-28 (1st Cir. 1982) ("Burger King
I"); <u>Masilionis v. Falley's, Inc.</u>, 904 F. Supp. 1224, 1229-30 (D. Kan. 1995) (produce manager of
a grocery store properly classified as exempt); <u>Palazzolo-Robinson v. Sharis Mgmt. Corp.</u>, 68 F.
Supp. 2d 1186, 1190 (W.D. Wash. 1999) (holding primary duty of employee, as assistant

41

manager and later manager of restaurant, was management, making her an exempt employee under the FLSA, where "[i]n spite of the time plaintiff attributes to performing non-managerial tasks, in the position of assistant manager as well as in the position of general manager, the plaintiff admits that she 'never stop[ped] being in charge of the facility'").

In any event, the FLSA regulations make it clear that the issue of whether a particular employee or group of employees has management functions as a primary duty, must be determined based on an individual fact-intensive inquiry. Indeed, Plaintiffs concede that the correct analysis requires a case-by-case examination of the actual work performed by each individual to determine whether the individual performing those specific duties meets the test for exemption. See Plaintiffs' Brief at 21 n.42.

### ii. Determining the percentage of time spent performing non-managerial job duties is fact intensive and not dispositive

With respect to the percentage of time Store Managers and Assistant Managers perform non-managerial functions, the competent evidence of record demonstrates that the actual job duties performed and the time allotted to each such job duty varies dramatically Plaintiff-to-Plaintiff and store-by-store.[48] The discretion permitted each Store Manager (by his or her District Manager) and each Assistant Manager (by his or her Store Manager) also varies

---

[48] In their responses to Defendant's First Interrogatories (No. 4), Plaintiffs identified job duties they performed and estimates as to the amount of time they spent performing these tasks. A brief review of Plaintiffs' responses to this Interrogatory demonstrates wide variation in even the alleged non-managerial job duties Plaintiffs performed, and the time spent performing them. Compare Plaintiffs Smith's, Gawor's and Holt's response to Interrogatory No. 4, Exhibits 64, 65 and 66. Moreover, their declarations demonstrate wide variations in the time they allegedly spent performing non-managerial tasks. Compare Gawor dec. at ¶ 5 ("I spent in excess of 50% of my time performing the same job duties as hourly employees....") with Holt dec. at ¶ 5 ("I spent in excess of 50% of my time (in fact approximately 80-95% of my time) performing the same job duties as hourly employees....").

drastically not only by store, but over time and by the qualification and skill levels of various employees.[49] See Sections II, C, 1-2, supra at p. 8-9.

Moreover, Defendant has presented declarations from thirteen Store Managers and nine Assistant Managers (more than three times as many witnesses as Plaintiffs), all of whom work in the same general geographic areas as Plaintiffs (some in the same stores Plaintiffs used to work). All admit they are in charge of their stores, spend substantially more than fifty percent (50%) of their time performing managerial job duties, and perform varying job duties for different lengths of time. See Armstrong dec. at ¶¶ 5-14 (41.5 out of average 50 hour work week performing managerial duties); Aucoin dec. at ¶¶ 5-15 (45 out of 50 hours); Brogden dec. at ¶¶ 4-15 (39.5 out of 50 hours); Delmore dec. at ¶¶ 5-15 (55 out of 60 hours); Douglas dec. at ¶¶ 5-17 (45 out of 55 hours); Goodwin dec. at ¶¶ 6-18 (35.5 out of 53 hours); Gregory-Smith dec. at ¶¶ 7-14 (42.5 out of 56 hours); Guthrie dec. at ¶¶ 5-13 (32 out of 54 hours); Harbeck dec. at ¶¶ 5-17 (31.5 out of 51 hours); Humphrey dec. at ¶¶ 5-16 (45 out of 50 hours); B. Johnson dec. at ¶¶ 5-15 (40 out of 53 hours); L. Johnson dec. at ¶¶ 5-16 (49.5 out of 55); R. Kling dec. at ¶¶ 5-13 (51.5 out of 68 hours); Knox dec. at ¶¶ 6-14 (37.75 out of 55 hours); Langston dec. at ¶¶ 5-16 (40.75 out of 51 hours); Lewis dec. at ¶¶ 6-18 (48.5 out of 58 hours); Norris dec. at ¶¶ 6-17 (45.1 out of 50 hours); D. Owens dec. at ¶¶ 5-15 (42 out of 50 hours); P. Owens dec. at ¶¶ 5-16 (45 out of 51

---

[49] Plaintiffs testified, for example, that when a new district manager began supervising a store, their job duties and the amount of discretion afforded to them changed. See, e.g., Gawor dep. at 98 (new District Manager Greg Wilson did not require Gawor to travel to other stores to help out and demanded that she complete Daily Tour Sheets on a daily basis); Smith dep. at 353 (new District Manager Greg Wilson was "harassing" her and in comparison to other District Managers went to extremes to find issues with Smith's performance); Morris dep. at 167-68, 253, 292-93 (new District Manager Greg Wilson was more "nitpicky" than previous District Managers and afforded the Store Manager and Assistant Manager less discretion with regard to merchandising the store). Due to these variations, to determine if a particular Store Manager or Assistant Manager is exempt, the Court must examine the job duties performed by that individual during each discrete time period during which their job duties remained constant. For example, with regard to Plaintiff Walker, the Court must examine her job duties in each store she worked because she performed different tasks at each store. See Walker dep. at 153-54 (scheduled employees in Abbeville, but not Dothan), 161 (job duties varied depending on Store Manager), 190 (Dothan Store Manager delegated less managerial job duties to Walker than did Abbeville Store Manager).

hours); V. Reynolds dec. at ¶¶ 8-19 (43 out of 55 hours); T. Ryals dec. at ¶¶ 5-16 (41 out of 51 hours); L. Watson dec. at ¶ 4-15 (42 out of 50 hours). Moreover, they all admit that when they were performing job tasks that could be deemed non-managerial in nature, they continued to supervise all subordinate store employees.  Id.

It is virtually impossible to conclude, as Plaintiffs suggest, that determining the percentage of time Store Managers and Assistant Managers spend performing their varied job duties could provide a common factual or legal nexus justifying collective treatment. Nevertheless, for the sake of argument, assuming Plaintiffs could somehow offer sufficient proof of the specific job duties each Store Manager and Assistant Manager performed, the Court would still have to consider the fact-specific issues of whether each such job duty is managerial or non-managerial, the amount of time spent on each job duty, and the ultimate percentage of time spent on non-managerial job duties.

Even if the determination of the amount of time spent performing certain types of job duties was subject to collective treatment, concluding that an employee who is classified as exempt under the executive exemption spent more than fifty percent (50%) of his or her time performing non-managerial functions does not establish a violation of the FLSA.[50]  The FLSA

---

[50] It is unreasonable to conclude that the executive exemption fails "merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt task."  Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1114 (9th Cir. 2001).  Rather, an "employee's primary duty is usually what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time."  Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir. 1990); see also De Jesus Rentas v. Baxter Pharmacy Servs. Corp., 286 F. Supp. 2d 235, 241 (D.P.R. 2003) (citing Bohn v. Park City Group, Inc., 94 F.3d 1457 (10th Cir. 1996)); Burger King I, 672 F.2d at 227 (holding assistant managers who spent the majority of their time doing the same labor as hourly employees still had management as their primary duty; "the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions"); Horne, 775 F. Supp. at 190 (holding "[t]hat the amount spent on non-management tasks is greater than fifty percent is not dispositive, particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary

44

regulations provide that "time alone ... is not the sole test, and in situations where the employee does not spend over fifty percent of his time in managerial duties, he might nevertheless have management as his primary duty...." See 29 C.F.R. § 541.103; see also Thomas, 64 F. Supp. 2d at 1212-13 (holding restaurant manager's primary duty was management irrespective of whether restaurant manager spent more than fifty percent (50%) of her time performing non-managerial duties).

> ### iii. The pertinent factors other than time are not subject to collective treatment, and, in any event, support a conclusion that Plaintiffs are properly classified as exempt

In Thomas, Judge Thompson recognized that the Department of Labor Regulations provide for two alternative tests to determine whether an employee has "management" as his or her "primary duty." 64 F. Supp. 2d at 1210 (citing 29 C.F.R. § 541.103). First, "if the employee spends over 50% of his time performing management duties, then he has management as his primary duty." Id. If not, that does not end the inquiry. Id. The Court must then analyze whether, on balance, the following other pertinent factors support the conclusion that the employee has management as his or her primary duty: (1) the relative importance of the managerial duties as compared with other types of duties; (2) the frequency with which the employee exercises discretionary powers; (3) his or her relative freedom from supervision; and

---

duty is managerial"); Burger King II, 675 F.2d at 520; Murray I, 939 F.2d at 618 (holding that store managers were responsible for the day-to-day store operations and even though they spent as much as 90% of their time devoted to non-management duties, their primary duty was management of the enterprise); Sturm, 864 F. Supp. at 1353 (concluding that 50% rule of thumb used by the Department of Labor was not generally applicable with respect to activities of convenience store manager (retail setting) and concluding that the decision as to whether an employee is exempt or non-exempt will turn in most cases on whether the employee was "in charge"). Other courts have abandoned the time factor in the short test because the number of hours spent doing line-work is not dispositive when the work is done while simultaneously supervising employees or performing management tasks. See, e.g., Jones v. Virginia Oil Co., No. 02-1631, 2003 WL 21699882 (4th Cir. Jul. 23, 2003) (manager of retail restaurant was properly classified as exempt executive despite performing non-managerial work).

(4) the relationship between his or her salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. Id. (citing 29 C.F.R. § 541.103). Reviewing each of these factors with respect to each potential Plaintiff would not be efficient or manageable. Alternatively, a review of these factors demonstrates that Plaintiffs satisfy them and are properly classified as exempt.

> **(a)    The relative importance of the managerial duties as compared with other types of duties**

The determination of the relative importance of the managerial duties, as compared with other types of duties, performed by Store Managers and Assistant Managers is a fact-intensive question that weighs against collective treatment. The Court will be required to consider the managerial duties performed by each individual Store Manager and Assistant Manager. Even if the Court were to conclude that it could make this analysis on a more global basis, the record evidence demonstrates that, although the manner in which they perform their duties and fulfill their responsibilities varies, the relative importance of each Store Manager's and Assistant Manager's managerial duties compared to their non-exempt duties supports the exemption.

Although Plaintiffs imply otherwise, and attempt to de-emphasize their responsibilities, multi-million dollar retail outlets do not run themselves. Rather, they are run by Store Managers (and Assistant Managers in the Store Manager's absence) whose duties are crucial to each store's success. See generally, Thomas, 64 F. Supp. 2d at 1212; Burger King II, 675 F.2d at 521. All Store Manager Plaintiffs acknowledge that they were the highest-ranking employee on site and were in charge of their stores. See Section II, B, 1, supra at p. 3. Similarly, all Assistant Manager Plaintiffs acknowledge that when their Store Manager was not present (which was the

vast majority of time Assistant Managers were on duty because of the rotating schedule), they were in charge of the store. See Section II, B, 2, supra at p. 4-5.

> In Burger King I, 672 F.2d at 226, the First Circuit Court of Appeals stated:

> The supervision of other employees is clearly a management duty. The fact that Burger King has well-defined policies, and that tasks are spelled out in great detail, is insufficient to negate this conclusion. Ensuring that company policies are carried out constitutes the "very essence of supervisory work" ... [it] cannot be denied that the supervisory work of the assistant managers qualifies as management under the regulations.

Here, as in Burger King I, the Store Manager and Assistant Manager Plaintiffs directly supervised associates and ensured they performed their jobs in accordance with Rite Aid policies and applicable laws. See Sections II, B, 1-2, supra at p. 3-6. Defendant does not dispute that some of Store Manager and Assistant Manager Plaintiffs performed some job duties that could be classified as non-managerial. Even when performing such duties, however, they did so in a supervisory, and thus managerial capacity. Id.

In Thomas, the Court concluded that the record evidence demonstrated that even though the plaintiff worked alongside non-exempt employees and performed similar duties to them, she was ultimately answerable for the restaurant's performance. Id. at 1206. The court specifically recognized that plaintiff performed the following job duties: (1) interviewing and hiring employees; (2) setting and adjusting employees' work schedules; (3) directing the work of subordinate employees; (4) disciplining and firing employees; (5) handling employee complaints and grievances; (6) maintaining production and sales records; (7) determining the work techniques to be used; (8) apportioning work to employees; (9) ensuring that work was done safely; (10) accounting for inventory and preventing theft; (11) assuring production quality; (12) doing the work of unexpectedly absent employees (13) balancing the books and making bank deposits; (14) ensuring that receipts matched register sales; (15) ensuring that the employees

47

maintain the facility; and (16) completing paperwork on a daily basis.[51]  Id. at 1207.  Some of

these duties were also performed by other employees; however, as the court recognized, plaintiff

was ultimately responsible for the performance of these duties.  Id.

Many of Plaintiffs' daily activities mirrored those described in the regulatory language

and by the court in Thomas.  The Store Manager Plaintiffs, and the Assistant Manager Plaintiffs

(depending on which Store Manager was in charge), interviewed, selected, disciplined and, when

necessary, terminated employees; scheduled employees (including days and hours each would

work); directed and supervised the work of employees; handled employee complaints and

grievances; reviewed, prepared and maintained production and sales records; assisted and

apportioned work to employees; accounted for inventory; balanced the books; made bank

deposits; ensured that receipts matched register sales; ensured that the facility was properly

maintained; completed paperwork; determined when work should be delegated; determined what

work should be delegated; determined how and when to use store resources; planned employees'

work on daily tour sheets; provided for the safety of customers and employees; appraised

employee's productivity; recommended raises; recommended promotions; prepared annual

performance evaluations; addressed customer complaints; took measures to control shrink (theft

and product loss); trained employees; checked in vendors; and merchandised their stores to

increase sales.  See Sections II, D, 1-15, supra at p. 10-24.

---

[51] The relevant Regulation describes "management" duties as follows:
> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay
> and hours of work; directing their work; maintaining their production or sales records for
> use in supervision or control; appraising their productivity and efficiency for the purpose
> of recommending promotions or other changes in their status; handling their complaints
> and grievances and disciplining them when necessary; planning the work; determining
> the techniques to be used; apportioning the work among the workers; determining the
> type of materials, supplies, machinery or tools to be used or merchandise to be brought,
> stocked or sold; controlling the flow and distribution of materials or merchandise and
> supplies; providing for the safety of the men and the property.  29 C.F.R. § 541.102(b).

Plaintiffs' assertion that their performance of the same duties as their subordinates was so substantial as to preclude a finding that management was their primary duty is misplaced.  Both the Store Manager and Assistant Manager Plaintiffs were directing the day-to-day activities of the store even when they were allegedly performing these non-managerial tasks.  See Section II, B, 1-2, supra at p. 3-6.  "One can manage while at the same time performing non-exempt tasks normally assigned to subordinates.  See Sturm, 864 F. Supp. at 1352 (citing Burger King I, 672 F.2d at 226).  The fact that an employee executes both managerial and non-managerial work tasks normally undertaken by hourly employees does not preclude his qualifying as a bona fide executive.  See Burger King II, 675 F.2d at 516; Burger King I, 672 F.2d at 226-27 (citing Rau v. Darling's Drug Store, Inc., 388 F. Supp. 877 (W.D. Pa. 1975)).  Similarly, Plaintiffs' argument that non-exempt employees may have performed managerial tasks is without merit.  That non-exempt employees performed some managerial tasks does not render those tasks non-exempt. See Baldwin, 266 F.3d at 1115; see also Murray I, 939 F.2d at 619 (concluding that it was irrelevant to the primary duty inquiry "whether other employees who reported to the manager were capable of performing part or even all of the manager's duties").

Rather than dispute that they performed the job duties listed above, Plaintiffs counter-intuitively assert that because they allegedly did not perform certain job functions (such as changing alarm codes) they must not have been properly classified as exempt.  First, Plaintiffs' characterizations are inconsistent with Plaintiffs' own deposition and affidavit testimony.  See Exhibits 46 through 52.  Plaintiffs admitted in their depositions that they actually did perform many of the job duties they testified in their Declarations they were not permitted to perform.[52]

---

[52] Plaintiffs' characterization of the job duties necessary to qualify as an exempt employee is ludicrous. For example, Plaintiffs correctly claim that Store Managers and Assistant Managers are not permitted unfettered discretion to promote or hire other Assistant Managers or Shift Supervisors. Although Store Managers, and sometimes Assistant Managers, interview candidates and provide recommendations,

See spreadsheets comparing Plaintiffs sworn declarations to their deposition testimony, attached hereto as Exhibits 46 through 52.  The Court should construe the contradictory testimony against Plaintiffs, or strike it from the record.  See McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (holding in the context of summary judgment, affidavit that contradicted party's deposition testimony did not create an issue of material fact because it is a sham which should be disregarded by the court); Rice v. Barnes, 149 F. Supp. 2d 1297, 1300 (M.D. Ala. 2001) (striking inherently inconsistent portion of sham affidavit).

To the extent any Store Manager or Assistant Manager fails to spend at least fifty percent (50%) of his or her time performing managerial duties, that manager is mis-performing.  Such lack of performance does not eliminate that employee's exempt status.  An exempt employee does not become non-exempt simply because that employee fails to properly perform the assigned functions of his or her job.  See Thomas, 64 F. Supp. 2d at 1211-12 (non-managerial duties irrelevant to determining restaurant manager's primary duty when time spent preparing and serving food was done in defiance of supervisor's orders); see also Ramirez v. Yosemite Water Co., 978 P.2d 2, 13-14 (Cal. 1999) (time during which employee is engaged in non-exempt work because of employee's own substandard performance should not be considered as non-managerial time in determining the exempt status of employee).  The importance of Plaintiffs' managerial tasks in relation to their non-managerial tasks were monumental.  Without them, the stores could not have survived.

---

District Managers normally have final authority with respect to hiring and promoting Store Managers, Assistant Managers and Shift Supervisors.  See Exhibit 58, Shift Supervisor Promotion Policy.  Most employees in the business and professional worlds do not hire their colleagues or superiors.  If hiring management level employees was a requirement of the test for application of the executive exemption, some CEOs of publicly traded corporations, who act subject to the oversight of, and limitations set by, the board of directors, would not be classified as an exempt executive employee.  Plaintiffs had discretion and authority to hire associates.  See Section II, D, 1, supra at p. 10.

**(b)     The frequency with which the
            employee exercises discretionary
            powers**

The record evidence indicates that many of Plaintiffs' managerial tasks – including

hiring, disciplining employees, setting and adjusting work schedules, apportioning work to

employees, evaluating the performance of employees, recommending raises and promotions, and

directing and apportioning work to employees – were discretionary. Plaintiffs appear to assert

that because Rite Aid has well-defined policies that spell-out required tasks, they did not exercise

discretion. See Plaintiffs' Brief at 13. Plaintiffs also appear to assert that because they had

District Managers, their discretion was circumscribed. Id. at 14. Neither of these assertions has

any merit.

Even with the alleged detailed instructions and manuals Plaintiffs claim they received

from Rite Aid, Store Managers and Assistant Managers are required to and do exercise

significant management discretion in operating the stores. This is evidenced by Plaintiffs' own

deposition testimony. See Section II, D, 1-15, supra at p. 10-24. Moreover, the fact that Rite

Aid has well-defined policies that spell out management responsibilities is insufficient to negate

the conclusion that supervising employees is a management duty. See Burger King I, 672 F.2d

at 226; see also Burger King II, 675 F.2d at 521-22 ("The exercise of discretion ... even where

circumscribed by prior instruction, is as critical to [the company's] success as adherence to 'the

book.' Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed

guidelines, but judgments must still be made."); see also Murray I, 939 F.2d at 619 ("[W]e do

not believe that the local store manager's job is any less managerial for FLSA purposes simply

because he or she has an active regional manager boss. [T]he manager of a local store in a

modern multi-store organization has management as his or her primary duty even though the

51

discretion usually associated with management may be limited by the company's desire for the standardization and uniformity."). "Ensuring that company policies are carried out constitutes the 'very essence of supervisory work.'" Burger King I, 672 F.2d at 226 (citation omitted).

Plaintiffs appear to assert that because the District Managers made visits to their store, their discretion was circumscribed. The mere fact that superiors "check in" on retail establishments is insufficient to disprove exempt status. See Cowan, 120 F. Supp. 2d at 690 (citing Murray I, 939 F.2d at 619). In Murray II, 50 F.3d at 570, the Eighth Circuit stated:

> Most if not all nationwide companies with multiple outlets establish standardized procedures and policies to guide individual store managers. This practice may circumscribe but it does not eliminate the discretion of the on-site manager of an isolated store who is responsible for day-to-day operations. Similarly, active supervision and periodic visits by a regional manager do not eliminate the day-to-day discretion of the on-site store manager.

Contrary to their assertions, Plaintiffs had the authority to hire and fire employees, determine the work techniques to be used, determine when employees could take vacation time, recruit employees, and check in vendors. See Sections II, D, 1-4, 9, supra at p. 10-16, 18-20. They were ultimately in charge of the day-to-day operations of their stores. See Sections II, B, 1-2, supra at p. 3-7.

### (c)   Plaintiffs' relative freedom from supervision

That Plaintiffs were free from daily supervision weighs heavily in favor of the exemption. District Managers visited stores only once or twice a month and provided little other oversight. Although Plaintiffs were required to adhere to Company policies and submit reports, they were, for the great bulk of their working time, in charge of the retail facilities they managed. See Burger King II, 675 F.2d at 522. Similarly, Assistant Managers were, for more than half of the time they worked, in charge of the retail facility. Although District Managers may have had

52

daily contact through e-mail, e-mail transmissions certainly did not eliminate the discretion of the on-site Store Manager and Assistant Manager. See Murray II, 50 F.3d at 570 (citing Donovan v. Waffle House, Inc., 26 Wage & Hour Cas. 868, 874 (N.D. Ga. 1983)); Marshall v. Sally Beauty Co., No. 80-4138, 1982 WL 2184, at *3 (E.D. La. Apr. 19, 1982). Even if there was any merit to Plaintiffs' contention that they had little real control or authority over their stores, the fact remains that the Store Manager and Assistant Manager Plaintiffs admit they were alone and in charge of their stores the vast majority of the time without the physical presence of any supervisor. See also Thomas, 64 F. Supp. 2d at 1214 (recognizing that even with a hands-on manager, the manager was ultimately responsible for the restaurant).

      (d)    **Plaintiffs' compensation was substantially higher than hourly employees**

     Rite Aid's salaried Store Managers and Assistant Managers are paid substantially more than the hourly, non-exempt entry-level Associates and Shift Supervisors they supervise. LeClair dec. at ¶ 6. Although the rates and ranges of pay for all store employees vary by geographic area, Assistant Managers normally earn several thousand dollars more per year than the hourly employees they supervise. Id. Store Managers normally earn several thousand dollars more per year than the Assistant Managers in the same geographic areas.[53] Id.

_____

[53] Specifically, entry-level associates are paid at or near minimum wage and receive incremental increases above minimum wage on a yearly basis. Rite Aid Policies and Procedures Manual, at RAH-01489, Exhibit 56. Associates promoted to Shift Supervisor normally receive a half-dollar per hour raise. Bailey dep. at 77. The Store Manager Plaintiffs earned salaries ranging from $28,698.00 to $54,591.00. LeClair dec. at ¶ 5. The Assistant Manager Plaintiffs salaries were $19,760.00 and $26,999.00.

      **(e)**      **All of these factors suggest**
                          **Plaintiffs were properly classified**
                          **and confirm individual issues**
                          **would predominate**

Even if the Court were to conclude that one of these factors favored Plaintiffs, "[t]he presence or absence of any one factor is not determinative; instead, the court must look at the total picture." See Thomas, 64 F. Supp. 2d at 1214. All four factors weigh heavily in favor of concluding that the Store Manager and Assistant Manager Plaintiffs were properly classified as exempt. As demonstrated by their job descriptions, management is the primary duty of Rite Aid Store Managers if they perform their job duties in accordance with company policies and procedures. Assistant Managers who perform their job duties and responsibilities in accordance with Rite Aid's policies and procedures are also clearly exempt.

Moreover, conducting this analysis for each opt-in would not be an efficient use of the Court's or the parties' time and resources. Numerous Courts have refused to certify FLSA classes requiring individual fact-intensive review and analysis such as that required under Plaintiffs' theory. See Morisky, 111 F. Supp. 2d at 498 (denying motion for conditional certification and notice on the grounds that issue of whether plaintiffs were properly classified as exempt employees was highly fact-specific and required individual analysis; "Even employees who hold the same job title do not necessarily perform the same work."); see also Clausman v. Nortel Networks, Inc., No. IP 02-0400, 2003 WL 21314065, at *4 (S.D. Ind. May 1, 2003) (reversing decision to grant notice, explaining: "[I]t is clear that each salesperson ... operates differently. It is precisely because these questions must be answered that the Court cannot approve notification of potential class members. The Court cannot make these inquiries of each of the unknown number of potential plaintiffs."); Sheffield, 211 F.R.D. at 413 (denying notice

regarding alleged off the clock and holding "a collective action certified on the facts presented

thus far would be mired in particularized determinations of liability and damages, rather than

collective consideration of common questions of law and fact"); Briggs v. United States, 8 Wage

& Hour Cas. 798, 800 (Fed. Cl. 2001) (denying census employees' request for notice based on

finding that each employee's claim would be "highly fact-specific and certification as a

collective action would limit plaintiffs' attorneys' ability to adequately represent the interests of

their clients as required by Rule 11").

　　　　Plaintiffs' assertion that the Court should conclude that other Store Managers and

Assistant Managers are similarly situated to them because Rite Aid has been allegedly involved

in some unidentified and non-descript other wage and hour related litigation is a non-starter. See

Plaintiffs' Brief at 20-21. Litigation and Department of Labor investigations in other states are

not relevant. See Barron, 242 F. Supp. 2d at 1099 (evidence from other litigation in other states

is neither relevant nor entitled to weight on the issue of similarity); see also Marsh, 242 F. Supp.

2d at 1089. Moreover, the California litigation did not involve FLSA claims, it involved only

claims under California's wage and hour laws, which are substantially different from the FLSA.

LeClair dep. at 11, 13, 25; compare Cal. Lab. Code § 515 (a); IWC Wage Order 7-2001,

§ (A) (1) with 29 C.F.R. § 541.101 et seq. Plaintiffs have offered no pleadings or other evidence

concerning the conclusion or claims asserted in any of the litigation they vaguely reference.

Notably, Store Managers in California remain exempt under California's state wage & hour

laws, which are more employee friendly than the FLSA.[54]

---

[54] Plaintiffs also ignore the fact that some Rite Aid Assistant Managers are members of unions and their
compensation is dictated by collective bargaining agreements. Panzer dep. at 20; Bailey dep. at 72-73.

2.    **Plaintiffs Are Not Similarly Situated To The Putative Class Members With Respect To The Relief They Have Standing To Pursue**

Plaintiffs, all former employees, are not similarly situated to current employees because they lack standing to pursue claims for prospective injunctive relief. See Enterprise Fire Fighters Ass'n v. Watson, 869 F. Supp. 1532, 1543 (M.D. Ala. 1994); see also Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1007 (11th Cir. 1997); Reid v. Lockheed Martin Aeronautics Co., 205 F.R.D. 655, 665 n.13 (N.D. Ga. 2001); Lang v. Kansas City Power & Light Co., 199 F.R.D. 640, 646 (W.D. Mo. 2001); Ward v. Johns Hopkins Univ., 861 F. Supp. 367, 378 (D. Md. 1994). To seek injunctive relief, a plaintiff must show "[a] real or immediate threat that the plaintiff will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'" City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (citation omitted); see also Wooden v. Bd. of Regents, 247 F.3d 1262, 1283-84 (11th Cir. 2001). A former employee, unlike a current employee, has "virtually no chance of suffering future" alleged wrongdoing, and therefore lacks standing to seek a prospective injunction. Davis v. Marsh, 876 F.2d 1446, 1450-51 (9th Cir. 1989) (plaintiff discharged from army lacks standing to seek injunctive relief); see Hawkins v. Groot Indus., Inc., No. 01-C-1731, 2003 WL 22057238, at *2 (N.D. Ill. Sep. 2, 2003).

In contrast, current Rite Aid Store Manager and Assistant Managers would have standing to assert claims for prospective injunctive relief. See Reid, 205 F.R.D. at 665. Therefore, Plaintiffs' claims for relief, which are limited to claims for damages unique to each individual Plaintiff, are not similar to the claims for prospective injunctive relief that can be asserted by current employees. See Wooden, 247 F.3d at 1287-88 (explaining in Rule 23 context that typicality does not exist between current and former employees because former employees lack

standing to seek injunctive relief); Hawkins, 2003 WL 22057238 at *2 (explaining court cannot certify class of current and former employees under Rule 23 because named plaintiffs, all former employees, lack standing to seek injunctive relief while current employees could assert such claims). In light of the difference in the available claims for relief, Plaintiffs cannot demonstrate that they are similarly situated to the current Store Managers and Assistant Managers they improperly ask this Court to certify as a conditional class.

Moreover, Plaintiffs seek to include employees in two different job titles with somewhat different responsibilities and duties that undermines the similarity between the employees. Specifically, Store Managers bear primary responsibility for all store operations while Assistant Managers bear primary responsibility in the Store Manager's absence and then are limited by the discretion afforded by particular Store Managers. Moreover, there is an inherit conflict between Store Managers and Assistant Managers being in the same class. Store Managers directly supervise Assistant Managers and are potentially individually liable for claims asserted by Assistant Managers. In fact, Plaintiff Gawor supervised both Plaintiffs Morris and Walker. Gawor dep. at 285-86, 288. Because Store Managers (including Gawor) could be held individually responsible for potential claims of Assistant Managers (including Morris and Walker), there is an inherit conflict of interest between the two groups. See generally, White, 204 F. Supp. 2d at 1314.[55]

---

[55] Plaintiffs' counsel currently represents both Store Manager Plaintiff Gawor and Assistant Manager Plaintiffs Walker and Morris. The conflict of interest raised by these facts should be considered with regard to Plaintiffs' counsels' adequacy of representation of the proposed class.

**D.     PLAINTIFFS' PROPOSED COLLECTIVE ACTION IS WHOLLY
        UNMANAGEABLE**

**1.     Individual Issues And Defenses Predominate**

To proceed with a collective action, there must be no individualized issues that render

collective action treatment unmanageable. See Lusardi v. Lechner, 855 F.2d 1062, 1074-75 (3d

Cir. 1988) ("Whether a class action is appropriate ... because of the different individual defenses

... [is] entrusted to the district court's sound discretion."); see also Morisky, 111 F. Supp. 2d at

498-99; Bayles v. Am. Med. Response of Colorado, Inc., 950 F. Supp. 1053, 1066 (D. Colo.

1996); Thiessen v. Gen. Elec. Capital Corp., 996 F. Supp. 1071, 1081 (D. Kan. 1998) ("Thiessen

I"); Brooks, 164 F.R.D. at 568; Bonilla v. Las Vegas Cigar Co., 61 F. Supp. 2d 1129, 1138 n.6

(D. Nev. 1999) (stating that to proceed with a collective action, the issues "must not be distinct

and specific to individual plaintiffs"); Ray, 1996 WL 948231, at *4 (stating that "the court must

also look to specific factual similarities or differences and manageability concerns"). The factors

to be considered by the Court in determining whether individual issues make class treatment

inappropriate include: (1) the disparate factual and employment settings of the individual

plaintiffs; (2) the various defenses available to the defendant that appear to be individual to each

plaintiff; and (3) fairness and procedural considerations. See Lusardi v. Xerox Corp., 188 F.R.D.

351, 359 (D.N.J. 1987) ("Lusardi I"); Bayles, 950 F. Supp. at 1066; Thiessen I, 996 F. Supp. at

1081; Brooks, 164 F.R.D. at 568.

"As previously discussed, the determination of whether an employee is exempt is an

inquiry that is based on the particular facts of his employment and not general descriptions."

Ale, 269 F.3d at 689. In this context, it is utterly impossible to conclude, as Plaintiffs suggest,

that all Store Managers and Assistant Managers are improperly classified as exempt employees.

In Morisky, 111 F. Supp. 2d at 498, plaintiffs alleged that all plaintiffs were similarly situated in that the potential class was limited to exempt employees in one location who fell within discrete salary grade levels and were not paid overtime compensation for hours worked in excess of 40 hours per week. The Court agreed with the defendant that fact specific inquiries and the dissimilarities between the job duties of the named plaintiffs and opt-in plaintiffs employed at the same facility still made collective action treatment inappropriate. The Court found that the determination of which employees are entitled to overtime pay under the FLSA was dependent on an individual, fact-specific analysis of each employee's job responsibilities. In denying class certification, the Court explained that because evaluation of the claims would have to be made on an employee-by-employee basis, "litigating this case as a collective action would be anything but efficient." Id. at 499.

Defendant will assert factual defenses unique to each Plaintiff, which would require protracted mini-trials over an extended period of time. For example, some Plaintiffs may be subject to the administrative exemption if they are not subject to the executive exemption. Defendant has also presented testimony from employees in Plaintiff Smith's store that she rarely performed non-managerial work, stayed in her office ninety percent (90%) of the time, and worked substantially less than the hours she now claims that she worked. See Declarations of Donna Glass, Jason Norris, and DeWanna McClure, Exhibits 7, 20 and 19, respectively. Defendant will present factual defenses as to both liability and damages for each Plaintiff.

The Court should also consider prejudice to the Defendant that might result from trying individual claims together as Plaintiffs suggest. See Bayles, 950 F. Supp. at 1067. Where, as here, individualized determinations and defenses are necessary upon an employee-by-employee basis, courts should refuse to permit collective treatment. See Tucker, 872 F. Supp. at 948-49;

Ulvin v. Northwestern Nat'l Life Ins. Co., 141 F.R.D. 130, 131 (D. Minn. 1991); Lusardi I, 118

F.R.D. at 352. Indeed, courts note that where individualized determinations are necessary, a case

will likely disintegrate into a series of mini-trials on each putative class member's individual

claims. See, e.g., Thiessen v. Gen. Elec. Capital Corp., 13 F. Supp. 2d 1131, 1143 (D. Kan.

1998) (decertifying collective action of only 23 plaintiffs after determining their individualized

issues would convert the case to "23 individual jury trials") ("Thiessen II"), reversed on other

grounds, 267 F.3d 1095 (10th Cir. 2001), cert. denied, 536 U.S. 934 (2002); see also Ray, 1996

WL 938231 at *5 (refusing to certify collective action given "significant manageability problems

inherit in a trial of 1000 plus individuals"); Lusardi I, 118 F.R.D. at 370-71 (decertifying

collective action due to "serious questions" regarding manageability of what would amount to

well over 1,000 separate trials). As one district court recently commented:

> [T]he court is concerned with coherently managing a trial of the action and
> presenting the evidence in a manner that will not confuse the jury or unduly
> prejudice any party. If the defendants actually do possess substantial evidence of
> bona fide individualized defenses, the result may be such a mish-mash of highly
> detailed evidence that in a collective action both the defendants and the opt-in
> plaintiffs would run the risk of having any individualized consideration of the
> claims lost in the mire. There is simply a realistic limit on what a jury may
> reasonably be expected to absorb, retain and process....

Thiessen I, 996 F. Supp. at 1084.

Plaintiffs have offered absolutely no legitimate justification, or even coherent allegations,

to support proceeding with this matter as a collective action. Moreover, the uncontroverted

evidence is that Store Managers and Assistant Managers in each store have somewhat differing

job duties and responsibilities and different district managers who expect them to perform certain

tasks in certain manners. In sum, Plaintiffs have not demonstrated that the employment

circumstances of Store Managers and Assistant Managers in Rite Aid's 3,400 stores are similar.

There is simply no similarly situated class of employees that could be subject to collective action treatment under Plaintiffs' theory.

### 2. Collective Action Treatment Would Be Inefficient

Plaintiffs' request for notice should be denied because the resulting collective action potentially would require the Court to conduct mini-trials for years on end, making the collective action unmanageable in the extreme. While the collective action is designed in part to lower individual costs by pooling resources, the Supreme Court has held that a second and equally important goal is the benefit to the judicial system from the "efficient resolution in one proceeding of common issues of law and fact." Sperling, 493 U.S. at 170. This purpose of achieving efficiency in the judicial system is not served by grouping "a lot of individual people with specific grievances" together, as it quickly becomes "a monster that no one can deal with." EEOC v. MCI Int'l, Inc., 829 F. Supp. 1438, 1445-46 (D.N.J. 1993) (denying collective action status). Indeed, one court noted that "[i]t is oxymoronic to use [a collective action] device in a case where proof regarding each individual plaintiff is required to show liability." Bayles, 950 F. Supp. at 1065.

As a general matter, the larger the proposed collective action, the less manageable it will be. In the Ray v. Motel 6 Operating LP, the court was confronted with a request for notice under Section 216(b) to 1,000 to 1,500 present and former assistant motel managers (approximately 10% of the number of employees Plaintiffs seek to include in their proposed class). 1996 WL 938231 at *2. The trial court held that the "significant manageability problems inherent in a trial of 1000 plus individuals demonstrate that it is inappropriate to pursue this case as a class action [under Section 216(b)]." Id. at *5. Notice should therefore be denied unless a plaintiff can demonstrate that the proposed collective action would be manageable. "As a matter of sound

case management, a court should, before offering to assist plaintiff in locating additional

plaintiffs, make a preliminary inquiry as to whether a manageable class exists." D'Anna, 903 F.

Supp. at 894 (citation omitted); accord Severtson, 137 F.R.D. at 266-67.

The collective action that Plaintiffs ask this Court to certify could, for a number of

reasons, consume judicial resources for years. Thus, the request for notice should be denied.

### a.    Opt-in discovery after notice would be unmanageable

Notice is just the first part of a two-step process under a Section 216(b) collective action.

Following notice and identification of people interested in opting in, the Court must determine

whether the opt-ins actually are similarly situated and should be allowed to proceed as part of a

collective action. Accordingly, after notice to the potential opt-ins, discovery would proceed

with regard to each individual who elects to opt in. This Court would then have to determine

whether each proposed opt-in is, in fact, similarly situated to be included in the litigation of this

case. This determination alone could implicate a number of witnesses for each potential opt-in,

including various District Managers, co-workers, and subordinate employees.

### b.    Each individual opt-in would be required to establish liability and damages

Each Plaintiff and each of the approximately twelve thousand (12,000) potential opt-ins

would have to prove his or her own claim through a separate mini-trial. Each claimant would be

required to carry his or her burden of proof that he or she was not properly classified as a bona

fide executive. If liability were established, then the Court would have to move on to a

determination of damages. This would not be a simple mathematical calculation and would be

subject to individual specific defenses. Plaintiffs' lack of common proof inevitably means that

the claims would be won or lost based on the individualized and anecdotal recollections of each

employee degenerating into individual employees telling their individual stories. Potentially

hundreds, if not thousands, of lawsuits would be tried before this Court to a single jury. Quite

simply, the Section 216(b) collective action mechanism was neither designed nor intended for

litigation on the grand scale proposed by Plaintiff. This is especially true upon contemplation of

the potentially overwhelming number of individual-specific issues presented by this case.

### E.     PLAINTIFFS' EVIDENCE DOES NOT SUPPORT NOTICE OF A COLLECTIVE ACTION IN THEIR OWN STORES OR DISTRICTS, LET ALONE NATIONWIDE

Even if the Court concluded that notice should be issued, the breadth and scope of the

notice Plaintiffs' propose is not supported by the record. It is Plaintiffs' burden of proof to

produce admissible evidence to support the geographic scope of the proposed notice. See Horne,

279 F. Supp. 2d at 1235. Courts regularly decline to authorize notice as broad as requested,

choosing instead to authorize notice that matches the evidence before the Court. "[A] plaintiff

must demonstrate that employees outside of the work location for which the plaintiff has

provided evidence were similarly affected by alleged work policies in order for the court to

certify a collective action which extends beyond the plaintiff's own work location." Id. at 1235

(citing Harper, 185 F.R.D. at 363); see also Harper, 185 F.R.D. at 363 (refusing to recognize an

FLSA collective action extending beyond the plaintiff's restaurant absent evidence that other

restaurants handled overtime compensation issues similarly); Brooks, 164 F.R.D. at 569.

Here, Plaintiffs themselves only hail from a handful of stores in two small geographic

areas, located within two Districts and one Region. See Plaintiffs' Declarations at ¶ 2, attached

to Plaintiffs' Motion as Exhibits 23, 25, 27, 29, 31, 32, and 33. Plaintiffs offer no evidence that

they and the members of the proposed class are similarly situated with respect to geographic

location. Indeed, they offer no evidence that individuals outside of their own stores are similarly

situated to them. To the extent the Court certifies a class, it should be limited to the stores where

Plaintiffs worked, or, at most, the two Districts where Plaintiffs worked because, under Plaintiffs theory, the District Managers largely govern the responsibilities and discretion of the Store Managers and Assistant Managers they supervise.

Courts have commonly refused to provide notice to a proposed collective action of employees who allege to have been improperly classified as exempt employees and worked at various locations of a company because, in that scenario, differences in the job duties cannot be attributed to any centralized management action. See Ray, 1996 WL 938231 at *4 (declining to provide notice to more than one-thousand employees because motel properties had different budgets and overtime so the pressures to work off the clock could not be attributed to any centralized management action); Harper, 185 F.R.D. at 362 (rejecting the plaintiffs' inference of widespread overtime violations based on alleged pressure to reduce labor cost and denying notice to facilities in six states).

In Horne, the Court denied the plaintiff's request for notice to others who held the same position and allegedly were not paid for overtime work, based on evidence that the plaintiff's claims arose from his supervisor's individual requirements. The Horne Court held, "other appraisers who were not supervised by plaintiff's supervisor, while they may have been made subject to the same production goals, where not necessarily subject to the requirement if they clock out by 5:00 p.m. and, therefore, should not be included within the scope of any purported collective action." 279 F. Supp. 2d at 1235-36; see also Hall, 2002 WL 413901 at *1 (holding plaintiff's "unsupported assertions of widespread violations" of the Fair Labor Standards Act were "not sufficient to meet Plaintiff's burden" under the notice requirements of Section 2l6(b)); Tucker, 872 F. Supp. at 948 (denying certification beyond one facility because wage and scheduling decisions were made at different levels of management in each facility); Clark v.

Dollar General Corp., No. 3:00-0729, 2001 WL 878887, at **5-6 (M.D. Tenn. May 23, 2001)
(limiting certification of assistant manager class to specific districts in two states).

Thus, courts will narrow certification where a named plaintiff from one location seeks to
include other locations from other states or regions. See, e.g., McQuay v. AIG, Inc., No.
4:01CV00661, 2002 WL 31475212, at *3 (E.D. Ark. Oct. 25, 2002) (finding proposed
geographic size of 29 states in 54 separate locations unreasonable and significantly limiting
scope of notice); Harper, 185 F.R.D. at 363 (denying certification for employees in restaurants in
six different states because the employees were subject to different working conditions); see also
Lusardi v. Xerox Corp., 122 F.R.D. 463, 465 (D.N.J. 1988) ("Lusardi II") (decertification
required where employees were from facilities covering 16 different states).

Likewise, courts will deny, or strictly limit, certification based on differences among
management, even within the same company. See White, 204 F. Supp. 2d at 138; see also
Camper v. Home Quality Mgmt., Inc., 200 F.R.D. 516, 521 (D. Md. 2000); Harper, 185 F.R.D.
at 363; Brooks, 164 F.R.D. at 569 (ADA claim) (employees not similarly situated were decisions
made by various supervisors); Ulvin, 141 F.R.D. at 131 (same); MCI, Int'l, 829 F. Supp. at 1446
(same). Indeed, differences in who makes relevant decisions can be fatal to a plaintiff's
argument that employees under different management are similarly situated. See Tucker, 872 F.
Supp. at 948 (denying certification beyond one facility because wage and scheduling decisions
were made at different levels of management in each facility).

In sum, Plaintiffs have no admissible evidence concerning any alleged violations of the
FLSA outside of two limited geographic areas. This meager showing plainly is insufficient to
support any type of collective action whatsoever. See Haynes, 669 F.2d at 888 (unsupported
assertions that FLSA violations were widespread provided insufficient factual showing for

broad-based notice). The record demonstrates that Plaintiffs' job duties and responsibilities varied store-by-store and that they are not even similarly situated to other Store Managers and Assistant Managers in their own Districts, much less nationwide. See Sections II, C, 1-2, and D, 1-17, supra at p. 7-24.

In addition, Plaintiffs' attempts to extend Court-approved notice to all Store Managers and Assistant Managers employed by Rite Aid within the past three years, and thereby substantially increase the size of the putative class, should be rejected. Under the FLSA, a two-year statute of limitations applies. A three-year limitations period arises only when the plaintiff proves that violation was "willful." 29 U.S.C. § 255(a). Plaintiffs have made no showing that Rite Aid's unspecified purported violation was "willful." Thus, there is no basis for issuing notice to the overbroad putative class proposed by Plaintiffs within the three-year period prior to Plaintiffs filing their opt-in claims.

An employer acts "willfully" for purposes of a three-year statute of limitations if the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). "[T]he showing needed for a finding of willfulness is demanding in that even if an employer acted unreasonably, if the employer's action was not reckless in determining its legal obligations under the FLSA, such action is not 'willful.'" Duncan v. Brockway Standard, Inc., No. 1:90-CV-2867-GET, 1992 WL 510256, at *6 (N.D. Ga. Sep. 21, 1992); see also Aly v. Butts County, 841 F. Supp. 1199, 1201 (M.D. Ga. 1994).

In this case, there is simply no evidence to support the claim that Rite Aid acted with "reckless disregard" towards its obligations under the FLSA, thereby justifying a three-year limitations period. In fact, Rite Aid has audited its Assistant Managers and attempted to ensure it

complies with the FLSA. Moreover, it has relied on findings from various state departments of labor, including Oregon and Washington, that have concluded that its Assistant Managers are properly classified as exempt. Declaration of Wayne LeClair at ¶ 4, Exhibit 17. Furthermore, the United States Department of Labor has never formally investigated the exempt status of Rite Aid's Store Managers. Id.

Moreover, Plaintiffs' attempt to insert the "willfulness" issue into this litigation interjects yet another individualized issue that renders collective action treatment inappropriate. Whether an alleged violation is willful could depend on the unique circumstances of each individual claim. Because the "willfulness" issue may vary from region to region, district to district, store to store, or supervisor to supervisor, the statute of limitations, and thus the body of relevant evidence that the fact finder may consider, may vary. Thus, in one store, the fact finder might be able to base its findings on evidence going back three years, while in another store it might only be able to rely on evidence going back two years. Thus, the willfulness issue adds yet another area of complexity to this litigation, further demonstrating the impropriety of collective action treatment. Accordingly, Plaintiff should not be entitled to Court facilitated notice to all Store Managers and Assistant Managers within three years prior to the date on which they filed their Complaint.[56]

## F.    DUE PROCESS PROBLEMS WITH REPRESENTATIONAL PROOF

Even if Plaintiffs had not failed to satisfy their burden of proof at this stage, and the Court had any basis to determine that the Plaintiffs' and potential opt-ins' claims are somehow manageable, collective treatment of the individual claims would violate Rite Aid's constitutional due process right. The Due Process Clause guarantees a "fair opportunity to defend oneself."

---

[56] If the Court conditionally certifies any class and facilitates notice, Defendant requests a reasonable opportunity to address numerous inadequacies in Plaintiffs' proposed notice.

Consolidation Coal Co. v. Borda, 171 F.3d 175, 184 (4th Cir. 1999) (quoting Lane Hollow Coal

Co. v. Director OWCP, 137 F.3d 799, 807 (4th Cir. 1998)).  The opportunity to defend one's self

and to be heard is "[a] fundamental requirement of due process ... which must be granted at a

meaningful time and in a meaningful manner."  Armstrong v. Manzo, 380 U.S. 545, 552 (1965).

Therefore, the requirements of due process dictate that if an issue is determinative, "each party

should be afforded a full and fair opportunity to present evidence relevant to that issue and to

contest evidence proffered by any other party."  United States v. City of Hialeah, 140 F.3d 968,

976 (11th Cir. 1998).  As the Lusardi I Court noted, the FLSA provides for collective actions

"only where employees are similarly situated in order that a defendant be afforded an

opportunity to effectively defend.  Requiring less would ... amount to a deprivation of a property

right in violation of the Due Process Clause."  Lusardi I, 118 F.R.D. at 372.

        Due process also requires that the procedures before a jury allow them to engage in

comprehensible and meaningful decision-making.  Thus, one Court recently observed:

> The Court is also concerned that forcing the plethora of individual issues into a
> class action constitutes a disservice to both potential class members and the
> Defendant. [T]he Defendant will be in a position where it has to prepare for
> nearly 2000 different trials simultaneously. Finally, neither party can seriously
> expect a jury's full attention and consideration for the length of such proceedings,
> nor can they expect evenhanded, consistent treatment from beginning to end.
> This is not an indictment of the class action procedure, but an acknowledgment of
> human nature that will surely be present amongst the jurors. The Court
> understands this is a risk in all class actions; however, the risk is heightened here
> because of the number and nature of the individual issues.

Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 98 (W.D. Mo. 1997); see also

Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993) ("The systemic urge to

aggregate litigation must not be allowed to trump our dedication to individual justice, and we

must take care that each individual plaintiff's – and defendant's – cause not be lost in the shadow

of a towering mass litigation.") (citation omitted).

If this case proceeds as a collective action, Defendant's rights undoubtedly will be trampled. Perhaps all the claims will be heard by one jury resulting in an unacceptable, unending and confusing parade of witnesses that would be highly prejudicial to Rite Aid. See Bayles, 950 F. Supp. at 1065, 1067; see also Arnold v. Eastern Air Line, Inc., 712 F.2d 899, 906 (4th Cir. 1983) (per curiam); In re Masonite Corp., 170 F.R.D. 417, 425 (E.D. La. 1997). Alternatively, the trial may be unacceptably shortened or divided. For example, Plaintiffs might attempt to rely upon representational testimony or the trial may proceed on a bifurcated basis, which would violate Rite Aid's rights by having multiple fact-finders deciding the same issues. Further, any attempt to shorten or manage the trial that would prevent Rite Aid from raising each and every defense at an appropriate and meaningful time would violate Rite Aid's due process rights. See Armstrong, 380 U.S. at 552; City of Hialeah, 140 F.3d at 976; Lusardi I, 118 F.R.D. at 372.

In light of the Defendant's due process right, the FLSA provides for collective actions "only where employees are similarly situated in order that the Defendant may be offered an opportunity to effectively defend." In short, due process requires that Rite Aid be afforded the opportunity to present evidence of the countless individualized fact-issues and defenses applicable to each opt-in's claims. See, e.g., Mooney, 54 F.3d at 1215 (refusing to permit notice where there were a "variety of particular, differing, and sometimes unique defenses available to [defendant] in contesting the varied and disparate claims"); Bayles, 950 F. Supp. at 1067 (defenses such as plaintiff's implied agreement to policy cannot be addressed on a collective basis). It is Plaintiffs' burden of proof under §216(b) to address these manageability and due-process issues. Plaintiffs fail to address them in their brief and have not presented a plan to organize even the massive scope of discovery which would follow the proposed notice, let alone propose a manageable trial plan. Plaintiffs should not be permitted to use the mass of proposed

69

litigation and attempted confusion to unduly prejudice Rite Aid or to deprive it of due process and the right to a jury trial. Plaintiffs' proposed collective action is simply unmanageable and there is no way of making it any less unmanageable without trampling upon Rite Aid's rights and consuming the Court's resources for years to come.

## IV.    CONCLUSION

Defendant respectfully requests that Plaintiffs' Motion to Facilitate 29 U.S.C. § 216(b) Notice be denied. Plaintiffs have failed to meet their burden of proving that conditional certification is appropriate and should not be permitted to send notice pursuant to Section 216(b). In the alternative, Defendant requests that the Court limit the scope of any conditional class to Store Managers and/or Assistant Managers who worked in Plaintiffs' stores for a period of two years prior to July 21, 2003, permit Defendant an opportunity to object to Plaintiff's proposed notice, and revise Plaintiffs' proposed notice to protect Defendant's rights and comply with the law.

Respectfully submitted this **1st** day of June, 2004.

Daniel E. Turner, Esq.
Georgia Bar No. 719330
Nancy E. Rafuse, Esq.
Georgia Bar No. 621717

**ASHE, RAFUSE & HILL LLP**
1355 Peachtree Street, N.E.
Suite 500
Atlanta, Georgia 30309-3232
Telephone: (404) 253-6000
Facsimile: (404) 253-6060

*Admitted pro hac vice*

**LEHR MIDDLEBROOKS PRICE
& VREELAND, P.C.**
P.O. Box 11945
Birmingham, Alabama 35202-1945
Telephone: (205) 326-3002
Facsimile: (205) 326-3008

David J. Middlebrooks, Esq.

Attorneys for Defendant Rite Aid Corporation

70

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| SANDRA HOLT, DEBRA GAWOR, POLLY SMITH, JOANN MORRIS, MARTY COOPER, ADELIA HARTZOG, PAUL D. PITTMAN, and MARIE WALKER on behalf of themselves and others similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> RITE AID CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NUMBER: CV-03-A-748-N |

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the above and foregoing **DEFENDANT RITE AID CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION TO FACILITATE 29 U.S.C. § 216(b) NOTICE** on Plaintiffs' counsel by depositing the same in the U.S. mail, via first-class prepaid, and addressed as follows:

> Rocco Calamusa, Jr., Esq.
> WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.
> 1400 SouthTrust Tower
> 420 North 20th Street
> Birmingham, Alabama 35203

This /5t day of June, 2004.

Attorney for Defendant

71